**UNITED STATES of America**

v.

**Egidio CERILLI et al.**

**Crim. A. No. 76–22.**

United States District Court,
W. D. Pennsylvania.

Jan. 26, 1977.

Daniel H. Shapira, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Irving M. Green, New Kensington, Pa., for defendant Cerilli.

Dominic Ciarimbolo, Greensburg, Pa., for defendant Buffone.

Thomas R. Ceraso, Greensburg, Pa., for defendant Yakovich.

## OPINION

ROSENBERG, District Judge.

The matters now before me are on two motions, (1) a Motion To Dismiss Indictment filed July 23, 1976 against the defendants, Egidio Cerilli, Ralph Buffone and Maylan Yakovich; and (2) a Motion To Dismiss Indictment filed August 24, 1976 against the defendants, Egidio Cerilli, Ralph Buffone, Maylan Yackovich and John Shurina, or in the alternative for change of venue.

The original three defendants, Cerelli, Buffone and Yakovich were charged in the first ten-count indictment for violation of the Hobbs Act, 18 U.S.C. § 1951 and were tried to a jury during a period of three weeks, commencing on April 27, 1976. After counsel summations and a two hour charge on instructions to the jury and after the alternate jurors were excused, the jury

were locked up for deliberation shortly after noon. In the evening the jury was sent to dinner and after dinner some of the jurors revealed to the bailiffs that they had become disturbed during the afternoon by the noticeably unusual condition of one of their members. The bailiffs at approximately 8:00 p. m. were informed, and in turn informed the court who also in turn informed counsel, that this particular member of the jury was ill.

The processing of the ill juror from 8:00 p. m. that evening until approximately 1:15 a. m. is accounted for by the fact that at 8:00 p. m. I invited, with the consent of counsel, the United States Post Office nurse who examined the juror and found him to be in a highly nervous state with a blood pressure of 170/110. She declared that she was not permitted and would not administer drugs to the patient (other than tylenol) without a doctor's prescription and that this man needed a doctor. He asserted that he had no doctor. At 10:00 p. m., while the jury was still sequestered, and with the consent of counsel, I requested the same United States Post Office nurse to look at the juror again, before sending the jury to the hotel for the night. On this occasion I, with the approval of counsel, was present with the bailiffs who were previously present in the courtroom, with the door of my chambers and the door to the jury room open. All counsel with the court reporter were gathered in my chambers. The nurse then found the juror's blood pressure to be 175/112. She again emphatically declared that the juror was in need of a doctor and that she would not and could not prescribe for this man who was then in a worse nervous state than he had been at 8 o'clock.

I then questioned the juror, in the presence of the nurse and the bailiffs, and he advised that he had no doctor. All of this was reported to the assembled counsel and made a matter of record. Eventually, I believe it was on the suggestion of counsel for the prosecution to the United States Marshal, that the juror be sent to the nearby Central Medical Pavilion Hospital emergency room, because the Marshal had already contacted these authorities for a doctor to be sent to the court. The answer by the hospital representative was that the juror would have to be sent to the hospital because equipment and staff would be needed for testing; however, the hospital emergency crew would receive and report on the juror immediately, if he were brought to the hospital. All counsel agreed that he be sent to the hospital and this was done. All counsel, the defendants and the reporter waited in my chambers for the report from the doctor. That came shortly before 1 o'clock a. m. over the phone. With the consent of all counsel present, I repeated the doctor's statements as he gave them to me, after I had assured him that his confidentiality would be protected, since in this instance it would serve the just processing of the case. All of this is a matter of record *in camera* and I shall not give the more confidential details because of any possible reflections on any person.

In any event, after tests were made at the hospital by the doctor and his staff with their equipment, the doctor advised me, and I in turn repeated it to all those present in my chambers, that it was urgent that the juror be admitted to the hospital at once for a specific reason. I repeated the reason aloud to counsel and made it a part of the record. Particularly, the doctor stated, that it would be hazardous to send this one juror out with the other eleven for the night. All this, I say, was divulged to counsel and made a part of the record *in camera*. After the juror was admitted to the hospital, the eleven other jurors were sent to a motel for the night.

Thereupon the three counsel for the defendants refusing to proceed with eleven jurors moved for a mistrial, without any objection on the part of the prosecuting attorney. Orally I granted the motion, as reported on the record sometime after midnight, but I requested defense counsel to renew their motion on the next day in open court.

On the next morning the Assistant United States Attorney, without notice to opposing counsel, came to me in chambers and

told me that he had relented on his approval the night before and desired a re-examination by another doctor. In any event, after giving the matter due consideration and consultation with the Chief Judge, I denied the request. Orally, he suggested that I await the release of the ailing juror from the hospital and reunite them for further deliberation. I denied the suggestion as well, and later in open court granted the defendants' motion of a mistrial. In the meantime and without my knowledge, the prosecuting attorney instructed one of the bailiffs, who had left the juror in the hospital on the night before, to return to the hospital in the morning and stand watch over the juror. This bailiff remained with the juror until 4:00 p. m. When the deputy marshal informed me of the Assistant United States Attorney's action, I instructed the marshal that when a case is in process neither the prosecution nor the defense counsel has any right to direct the marshal as to what he is to do with jurors, but such instructions must come from the trial judge. Accordingly, the bailiff left the hospital at 4:00 o'clock p. m.

On the next day the marshal and the bailiff in attendance at the hospital reported to me that on the previous day while the bailiff was yet at the hospital watching the ailing juror, the hospital's daytime doctor came on the floor at about 3:00 o'clock p. m. and looked at the ailing juror with the remark that he had seen this patient before under similar circumstances. I thereafter summoned the jury commissioner with the file on this particular juror and learned that the juror's answers to the jury commissioner on information forms were similar to those given to the nurse—that he had no doctor and that he had no attorney.

A day later one of the highly prominent and fundamentally reliable newspapers in the city carried the story of its federal court reporter that I had excused the juror without having consulted with his "family doctor". This was an absolute falsehood and one I am certain that this highly reputable newspaper would never have published had it not gotten that information from what it would call a reliable source. I have attempted to fathom what that source might have been and cannot be persuaded that it could have been from the hospital nor the juror's private personal doctor, since he had none.

Some circumstantial persuasion might exist in what followed. When I denied the oral motion of the prosecuting trial counsel to hold the eleven jurors in abeyance until such time as the one being treated at the Central Medical Pavilion Hospital was released and to reunite them and direct them to resume deliberation as if no separation had occurred, the matter was publicized (by someone) and that evening the United States Attorney himself, as I observed him, appeared on television news broadcast and criticized me, and set himself up as the superior judge by stating that I was obliged to reunite the twelve separated jurors and cause them to continue to deliberate. From then on my staff was bombarded by news representatives for my reply, but of course, as a federal judge I could not and would not reply.

For a day or two the publicity subsided. Then on the following Friday morning, May 21, 1976, at 10:42 a. m., the prosecution filed a Motion To Reconvene and Poll The Jury. In the motion, the averment was that "the United States Attorney for this District *has reason to believe* that prior to the declaration of a mistrial at 12:30 A.M. on May 18, 1976, and prior to the separation of the ill juror, the jury had unanimously agreed on a verdict as to several counts of the indictment." (Emphasis added). The prosecution did not aver any facts as a basis by which the United States Attorney was induced to "believe" that he had "reason to believe" what he averred.

The motion also averred that the "Court had inherent power to recall the jury and determine whether or not they had reached a unanimous verdict . . ." A Certificate of Service was enclosed to the effect that a true and correct copy of the within motion "was served by mail on May 21, 1976 and orally transmitted by telephone to all counsel of record." Immediately there-

after my office staff was again bombarded by the communications media personnel on what and when my disposition of the motion would be. If that motion was filed for its sparse contents and in the manner in which it was done for the purpose of reawakening and procuring additional, but prosecution-sided publicity, it served the purpose as it appeared in the news media that afternoon.

At the same time it was obvious that if the prosecution really wanted speedy action on such a motion it could have easily notified all the defense counsel to come in at a particular time that day before the court when it would then present an emergency motion upon which I could have acted without delay. The very fact that the prosecution "served by mail" the motion on a Friday morning to the various defense counsel indicates essentially that it would take at least twenty-four hours for the mail to arrive from Pittsburgh into Westmoreland County, that is into Greensburg or New Kensington where defense counsel have their offices, and that this would be on a Saturday. Under our law, computing the days when answers are required to be filed, we exclude both Saturday and Sunday, and thus I would have concluded that the delivery of copies of the motion would ordinarily have come to defense counsel on Monday morning. And so counsel should have had at least twenty-four hours to answer the motion. As it turned out an answer was filed by defense counsel on Tuesday afternoon.

However, I need not be concerned with that answer because on Tuesday, May 25th, at 11:15 a. m., I filed a Memorandum Opinion and denied the motion of the United States Attorney to reconvene and poll the jury. Therein I stated very briefly and cited authority that a jury's verdict does not become effective until it is presented in open court and until counsel have had the opportunity to poll the jurors. I cited as authority *United States v. Taylor*, 507 F.2d 166, C.A.5, 1975.

Three days had already elapsed when the motion was filed on Friday morning and all eleven jurors whom I had been asked to reconvene for their factual information had been separated and had gone their own ways. Under such circumstances the motion, too, would have been late. In any event, the United States Attorney cited no law to support him or to contradict any cited authority. Yet on that evening the United States Attorney, again, personally went before the public on a television broadcast, which I personally observed, and officially stated that I was wrong in denying his motion to reconvene and poll the eleven members of the jury, that he could not appeal my decision, but that he could mandamus me to compel me to change my decision, but would not do this and would rather speed up the trial.

Judge Garth in *United States of America v. DeRosa et al.*, 548 F.2d 464, in an opinion filed January 11, 1977, at page 470 said:

"This Court has constantly and continuously emphasized that

A United States attorney in a criminal case has an even greater responsibility than counsel for an individual client. For the purpose of the individual case he represents the great authority of the United States and he must exercise that responsibility with the circumspection and dignity the occasion calls for. *United States v. LeFevre*, 483 F.2d 477, 478 (3d Cir. 1973)."

■ This publicity action by a United States Attorney between a halted first trial and the recommencement of the second trial in which he was and is the prosecutor was ethically and legally uncalled for and unwarranted. The United States Attorney in his powerful position and magnetically-drawing news media, knew very well that the appropriate place for him to try his case was before the court and not before the television public. He very well knew that I would not respond to his broadcasts or enter into public debate with him. His television demonstrations could not have been for the purpose of fairly convicting the three defendants in the courtroom before a jury of twelve, but could have been only for the purpose of convicting the trial judge *ex*

*parte* before the court of public opinion and coercing a leaning towards the prosecution's side. Such action by a powerful officer such as is the United States Attorney was prejudicial and must be condemned so that it may not be repeated. This must not be misunderstood. I have always had, and will most likely continue to have, the highest regard for the United States Attorney as a trustworthy gentleman of high principles. I attribute this incident only to inadvertent aberration which may occur to any human being.

However, it is necessary that the trial judge, even if critical of the action by counsel for one side or another, as so often happen in cases, nevertheless, remain neutral, fair and applies the law justly. That was, is and will be my function. And while I set these matters out in detail, it is done to provide a background for the evaluation of the defendants' request for a change of venue and for the further purpose of indicating to the defendants that the trial judge was well aware of many of the occurrences concerning which they complained. Accordingly, judgment must here be made on the facts as they exist and as the law is applicable to them.

Since a second indictment was subsequently presented, which contained six charges encompassing the original ten counts against the three original defendants, while adding another defendant, John Shurina, with sixteen counts, without a motion having been made by the prosecution to dismiss the original indictment, the defendants also complain that they are in effect being exposed to double jeopardy. The question in the first instance then must present itself to the trial judge on whether the prosecution intends to proceed upon both indictments as they would then contain duplicate charges. If it acts on the first indictment, it will have abandoned the second indictment with the additional counts and additional defendant, John Shurina. If it acts on the second indictment, will the three original defendants be prejudiced?

The defendants also contend that the second indictment is premature because if the first indictment is dismissed those same counts in the second indictment would also fail; and in the event the first indictment is dismissed, certain counts on the face of the second indictment occurring prior to August 5, 1976, would be beyond the statute of limitations, including the amount of conspiracy as it applies to overt acts prior to the expiration of the permissible statute of limitations. Because these questions are based upon hypothesis and speculation, I am not required to consider them presently.

At the last argument on the motions, the defendants submitted two voluminous exhibits, stipulated to by the Government as authentic, of a large amount of news articles found in various newspapers throughout the Commonwealth of Pennsylvania concerning this case. These defendants' Exhibits A and B are an accumulation of news articles concerning the same matters circulated about the same time by the wire services or local reporters. I have thoroughly reviewed these two exhibits.

The complaint by the defendants here is that the public action of the prosecution, particularly the United States Attorney, was frivolous, without any substantiation either in fact or law, and that the assertions were so prejudicial to the defendants as to deprive them of their rights to a fair trial in this District Court. These defendants contend that the televised press conferences, particularly, and the information given to the press by the United States Attorney prejudiced their rights to such an extent as to make it impossible for them to receive an impartial trial unprejudiced by anything that the United States Attorney might have said or done as based upon the prosecution's overreaching and bad faith activities.

Most of the publicity, it will be seen, heightens the prosecutorial values as it lowers—and condemns as already convicted—the three individual defendants. The publicity was well spread, particularly throughout the 25 counties comprising the Western District of Pennsylvania as it comprises the

jurisdiction from which this court's jurors are called and empanelled. It would be from these counties that persons for any retrial of these defendants must be summoned for jury service.

That all publicity did not leave some impact of bias or even conviction in the minds of some persons of this District, may not be dismissed out of hand as being improbable because by our modern method of communication there can never be some likelihood of a recollected and even biased carryover which would in some manner be unfair in a trial of a defendant. Under such circumstances our courts have held that reason and judicial concern must be left to the trial judge to see to it that defendants receive an unbiased, fair and just trial.

■ Whether or not, as of the time when a retrial should be rescheduled, the jury wheel would produce any persons who would have become familiar with any of the circulated publicity as of the time before, during and following the first trial of these defendants is problematical. If such persons were to be summoned and they recalled anything of the publicity which might in any way be prejudicial to the defendants, such information would be available to the trial judge and counsel for the parties as of voir dire time and the defendants could then be properly protected. The fact that there had been wide publicity in this case, as in many other cases, is in itself no indication that a fair trial cannot be had. Probably no greater example of that has been shown than recently when the public was deluged by the publicity in the cases of *United States of America v. Patricia Hearst*, 412 F.Supp. 873 (D.C.Cal.1976) and *United States of America v. Haldeman, et al.*, C.A.D.C.1976. And even in those cases, their trials were eventually had.

It is quite true that a probable effect of any imprudence on the part of the United States Attorney did in some way prejudice the defendants' rights to a fair trial. The only question is to what extent, then, has it occurred? Considerable time has elapsed since the motion for a mistrial was granted.

I have dutifully attempted to not only safeguard the defendants' fair trial but as well I have protected the government's right to re-try its case by requiring the defendants to waive their rights under the Speedy Trial Act, 18 U.S.C. § 3161 et seq. The time delay has been of benefit to both sides, because the furor raised by the indiscreet and erroneous tactics of the prosecution have sufficiently died down. A better atmosphere will have been created by which a truly fair and proper voir dire may be had.

■ Directing myself specifically to the defendants' motions, I must base my decision on the law of the case. Any other basis for a decision would only result in futility. In any event, dismissal of the indictments is not the appropriate result upon a motion to dismiss based upon pretrial publicity, at least until a voir dire may be conducted. *United States v. Abbott Laboratories*, 505 F.2d 565, C.A.4, 1974; *United States v. Pfingst*, 477 F.2d 177, C.A.2, 1973; *United States v. Whiteside*, 391 F.Supp. 1385 (D.C.Del.1975); *United States v. Archer*, 355 F.Supp. 981 (D.C.N.Y.1972). These cases all dealt with prosecutorial misconduct of a sort.

In *United States v. Addonizio*, 313 F.Supp. 486 (D.C.N.J.1970), aff'd. 451 F.2d 49, C.A.3, 1972, the District Court held that "Even, however, accepting that characterization of the pre-trial publicity herein, this court is not persuaded that that fact alone necessarily precludes the possibility of selecting a fair and impartial jury for the trial of the indictment . . . See *Patriarca v. United States*, 402 F.2d 314, [C.A.1, 1968], cert. den. 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969); *United States v. Corallo*, 281 F.Supp. 24 (D.C.N.Y.1968)." (at page 493).

In *United States v. Haldeman, supra*, filed October 12, 1976, per curiam, the Court held at pages 26–27:

"We have carefully reviewed the 'Watergate' articles submitted by appellants, and we find that the pretrial publicity in this case, although massive, was neither

as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession. It is true that some of the pieces contained in the extensive collection of articles gathered by the appellants are hostile in tone and accusatory in content. The overwhelming bulk of the material submitted however, consists of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations. In short, unlike the situation faced by the Court in *Rideau*, we find in the publicity here no reason for concluding that the population of Washington, D.C. was so aroused against appellants and so unlikely to be able objectively to judge their guilt or innocence on the basis of the evidence presented at trial that their due process rights were violated by the District Court's refusal to grant a lengthy continuance or a change of venue prior to attempting selection of a jury."

This case is somewhat different in one respect from what the Court said in *United States v. Haldeman, supra,* at pages 26–27, in that the proportion of publicity might vary in our case from that in which the Court found was "straightforward, unemotional factual accounts of events and of progress of official and unofficial investigations." In tune with the current cases of this Circuit and others, it is at least more expedient to wait until a thorough voir dire before a motion to change venue should be entertained. Although not the best way, it is the judicially approved way.

■ While the defendants argue that a second indictment is premature, it is clearly true, nevertheless, that the government may have two or more indictments pending against a defendant on the same or related charges adding or subtracting pertinent counts. *United States v. Ragano,* 520 F.2d 1191, C.A.5, 1975; *DeMarrias v. United States,* 487 F.2d 19, C.A.8, 1973, cert. den. 415 U.S. 980, 94 S.Ct. 1570, 39 L.Ed.2d 877 (1974); *United States v. Wilsey,* 458 F.2d 11, C.A.9, 1972; *United States v. Garcia,* 412 F.2d 999, C.A.10, 1969; *United States v.*

*Bowles,* 183 F.Supp. 237 (D.C.Me.1968). A second indictment in this case, at this time, is not premature especially when there is an outstanding motion on the first.

■ All counts in the first indictment occurred within the five year period required by law, the earliest count occurring in March 1971, while the indictment was returned February 25, 1976. The second indictment was returned in August 1976 and if the defense is arguing that Counts 5, 7, 8 and 9 are barred because they happened in April and May 1971, it is no basis for argument. The filing of an indictment tolls the statute of limitations and if a second indictment is filed prior to the dismissal of the first, the counts in the second are timely because the original statute was tolled by the first indictment. *United States v. Wilsey, supra; United States v. Garcia, supra; United States v. Feinberg,* 383 F.2d 60, C.A.2, 1967; *United States v. Powell,* 122 U.S.App.D.C. 229, 352 F.2d 705, 1965.

■ Finally, as for the defendants' argument that overt acts charged in Count 1 would be beyond the statute of limitations, the statute does not begin to run on a conspiracy charge until the date of commission of the last overt act. *United States v. Johnson,* 165 F.2d 42, C.A.3, 1947, cert. den. 332 U.S. 852, 68 S.Ct. 355, 92 L.Ed. 422 (1948).

Accordingly, the defendants' motions to dismiss both indictments or in the alternative change of venue will be denied without prejudice.

To obviate any indication of bias or partiality on my part for either side or for any parties, and for the purpose of securing to the Government a fundamentally basic vehicle for its prosecution and for the defendants a fundamentally fair and impartial trial on the charges levelled against them in the indictments, I deem it feasible that I withdraw as the presiding judge in this case. I am therefore referring this action back to the Clerk of Court for reassignment to another judge for further disposition of the case.