**UNITED STATES of America**

v.

**Albert FRIEDMAN, Appellant.**

No. 80–2149.

United States Court of Appeals, Third Circuit.

Argued Feb. 23, 1981.

Decided May 21, 1981.

As Amended May 29, 1981.

Wilbur Greenberg (argued), Albert J. Olizi, Jr., Sidkoff, Pincus, Greenberg & Green, P.C., Philadelphia, Pa., for appellant.

Peter F. Vaira, U. S. Atty., Walter S. Batty, Jr., Asst. U. S. Atty., Chief, Appellate Section, Elizabeth K. Ainslie (argued), Asst. U. S. Atty., Philadelphia, Pa., for appellee.

Before ADAMS, ROSEN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Albert Friedman appeals from his conviction, after a trial by jury, on one count of transportation of checks in interstate commerce, knowing them to be stolen, converted or taken by fraud, 18 U.S.C. § 2314 (1976), and one count of conspiracy to violate the substantive statute, 18 U.S.C. § 371 (1976). In this appeal, Friedman raises questions challenging the indictment procedure, the sufficiency of the evidence, and certain statements of the prosecutor in the course of trial alleged to be improper and prejudicial. We conclude that these contentions are without merit and affirm the conviction.

### I.

In November of 1974, defendant Albert Friedman, an insurance agent licensed by the Commonwealth of Pennsylvania, per-

suaded six persons,[1] residents of Pennsylvania, to purchase through him life insurance policies issued by Lincoln National Life Insurance Co. The arrangements offered by the defendant and accepted by the six provided that no premiums were payable the first year of the policies. To obtain the policies, the defendant forwarded the applications of the six to broker Stanley Sabolsky, who submitted the applications through an insurance agency, Mindep, Inc., to Lincoln National Life of New York (Lincoln of New York), a wholly-owned subsidiary of Lincoln National Life of Fort Wayne. The New York subsidiary issued the policies and in turn submitted the applications to its parent in Fort Wayne.

In reviewing the policies, a consultant to the parent company concluded that these policies, written in Camden, New Jersey, and sold to Pennsylvania residents, should have issued directly from the parent company and not from Lincoln of New York. In early December at a meeting at Newark Airport, representatives of the two Lincoln insurance companies, including Sabolsky, agreed that the policies issued by the New York company would be recalled and new policies issued by the parent company. Because of differences in the manner in which the two companies compute premiums on policies, the premiums due on the parent-issued policies were less than those due on the New York policies. Believing erroneously that the insureds had actually paid first year premiums, the parent company sought to reimburse the six insureds for their "overpayment." Ultimately, six checks were issued as reimbursement, one to the wife of each insured, the wives named as payees because they were the owners of the policies. These checks, at least three of which passed through Sabolsky's office, were subsequently delivered to Friedman.

Upon receiving the checks, Friedman communicated with one of the insureds, Dr. Saltz, and told him about his reimbursement check. Dr. Saltz accepted it, but at Friedman's "suggestion" Dr. Saltz gave the agent "$2,000 or $3,000" in cash. This transaction is not at issue in this case. Friedman claims that he similarly communicated with each of the insureds and received permission to endorse and cash the other five checks, keeping the money, even though the checks were payable to the insureds' wives. The insureds denied any knowledge of Friedman's receipt of the checks or of their existence. Each wife testified that she had not endorsed a check nor authorized any other person to endorse or negotiate checks on her behalf. The endorsement and cashing of these five checks is the basis for Friedman's conviction.

Friedman admits endorsing the checks and delivering them to Sidney Grossman, a business associate, who cashed them. After certain deductions for debts owed by Friedman, Grossman returned the remainder, nearly $9,000, by check to Friedman. Friedman opened a bank account in which he deposited Grossman's check. The very next day Friedman drew a check on that account to Sabolsky for $5,000, a payment Friedman claims was in settlement of a debt he owed the broker.

On December 4, 1979, a grand jury indicted Friedman on five counts of interstate transportation of stolen, converted or fraudulently taken checks, 18 U.S.C. § 2314 (1976),[2] and one count of conspiracy, 18 U.S.C. § 371 (1976),[3] alleging that Friedman

---

1. Six men, Stanley S. Joseph, Bernard M. Greenberg, Fredrich Rieder, G. Dewey Carver, Cy S. Tabak, and Dr. Saltz, arranged with Friedman for the purchase of the policies. Each man was named as the insured in his policy; each man's wife was designated both policy owner and beneficiary.

2. Section 2314 provides, in relevant part:
   Whoever transports in interstate or foreign commerce any goods, wares, merchandise,

securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud;

. . . . .

   Shall be fined not more than $10,000 or imprisoned not more than ten years, or both. 18 U.S.C. § 2314 (1976).

3. Section 371 provides, in relevant part:
   If two or more persons conspire . . . to commit any offense against the United

conspired with Sabolsky. Following Friedman's motion on January 11, 1980, for dismissal of the indictment, the district court granted the Government leave to obtain a superseding indictment. On February 5, 1980, more than five years after the completion of the alleged crime, the grand jury returned a superseding indictment, charging defendant with one count of the substantive offense and one count of conspiracy. On February 22, 1980, Friedman moved for dismissal of the superseding indictment; the court denied the motion.

The jury returned a verdict of guilty on both counts of the superseding indictment. Various post-trial motions for acquittal or new trial were denied. Friedman was sentenced on July 22, 1980, to three years in prison, all but 10 days of which was suspended, and fined $10,000. This appeal followed.

## II.

Friedman argues that certain defects in the successive indictments render his conviction invalid. First, the original indictment against him charged five counts of violating the substantive statute, yet four of the five counts were on their face insufficient: only one met the jurisdictional amount of $5,000. Second, although the Government was able to obtain a superseding indictment, it was lax in having the first indictment dismissed. Thus, the first indictment had not been dismissed officially when Friedman's trial on the second indictment began.

### A.

Friedman first asserts that he has been put twice in jeopardy in violation of the fifth amendment by his trial on the superseding indictment before the original indictment was properly dismissed. The argument of Friedman rests on dicta in *United States v. Cerilli*, 558 F.2d 697 (3d Cir.), *cert. denied*, 434 U.S. 966, 98 S.Ct. 507, 54 L.Ed.2d 452 (1977), a per curiam opinion in which this court stated that

it has long been settled that the Double Jeopardy Clause is not abridged where there are two pending indictments, setting forth largely identical charges, against the same .. defendants. Only where the government attempts to proceed to trial on both indictments does the double jeopardy protection come into play.

*Id.* at 701 (footnote omitted). *See also United States v. Stricklin*, 591 F.2d 1112, 1115–16 n.1 (5th Cir. 1979) (although there may be two indictments charging the same offense outstanding prior to trial, the Government can proceed to trial only on one). Friedman contends that, the original indictment not having been dismissed when trial began, jeopardy attached to the original indictment. Therefore, he argues, he could not be convicted on the superseding indictment.

■ His argument fails for two reasons. First, although the district court had not dismissed the original indictment when trial began, it does not follow that the Government was proceeding on the original indictment. Rather, the Government contends and we agree that Friedman was tried solely on the superseding indictment. The Government's pre-trial memorandum, submitted two weeks prior to trial, indicates clearly that the Government was proceeding on the superseding indictment, which alleged only two counts. Moreover, the district court believed that only the superseding indictment was being pressed. When the defendant made his double jeopardy motion on the second day of trial, the court observed that the Government's proceeding on the superseding indictment "is obviously what is happening." On the third day of trial, the court informed the defendant, in answer to a renewed double jeopardy motion: "The original indictment is dismissed, whether it has been formally done or not . . . . We are concerned here only with the superseding indictment." Although the

States, . . . and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,-

000 or imprisoned not more than five years, or both.

18 U.S.C. § 371 (1976).

original indictment was not formally dismissed when trial began, it is plain that the Government was proceeding with only the superseding indictment.

There is a second problem with Friedman's argument. He cannot explain how jeopardy has attached twice. Initially, he had not shown why it should be presumed that when the trial began jeopardy attached to the original indictment, not the second indictment. On its face, more logically jeopardy attached to the *superseding* indictment. Further, he does not indicate a second attachment of jeopardy: there was only one jury, only one trial, only one verdict.

### B.

Friedman contends further that he could not have been tried on the superseding indictment because it was barred by the statute of limitations. The original indictment admittedly was timely. Following Friedman's motions to dismiss that indictment the Government, with leave of court, obtained a superseding indictment. That indictment, in the absence of the preceding indictment, would not have been timely: the general statute of limitations on noncapital offenses is five years, 18 U.S.C. § 3282 (1976), and more than five years had elapsed between the crime and the second indictment. But the superseding indictment is not time–barred if the timeliness of the original indictment tolls the limitation or triggers some exception.

Friedman, in his brief, expends considerable energy explaining why the Government cannot rely on 18 U.S.C. § 3288 (1976) in its argument that the superseding indictment is not barred. He is correct. Section 3288 permits a superseding indictment only in two instances:

> Whenever [1] an indictment is dismissed for any error, defect, or irregularity with respect to the grand jury, or [2] an indictment or information filed after the defendant waives in open court prosecution by indictment is found otherwise

defective or insufficient for any cause. . . .

In cases in which either of those events has occurred, "a new indictment may be returned within six calendar months of the date of dismissal of the indictment or information." *Id.* The superseding indictment of Friedman was obtained *before* his original indictment was dismissed. He at no time waived indictment. Thus, section 3288 is inapplicable.

But in this case, the Government does *not* rely on section 3288. Rather it relies on the doctrine that a valid indictment tolls the statute of limitations and that return of a superseding indictment *prior* to the dismissal of the original indictment does not violate the statute of limitations if the superseding indictment does not substantially alter the charge.[4]

The Government's position is that the bringing of the first indictment, which was timely, tolled the statute of limitations and that as long as it remained pending, the superseding indictment could be brought regardless of the statute of limitations, if the superseding indictment did not broaden the charges. The Government finds support for its position in *United States v. Grady*, 544 F.2d 598 (2d Cir. 1976). As in this case, the Government in *Grady* had obtained a timely indictment, and, while the original indictment remained pending, had obtained a superseding indictment that otherwise would not have been timely. In response to a statute of limitations challenge to the superseding indictment, the court held:

> Once an indictment is brought, the statute of limitations is tolled as to the charges contained in that indictment. . . . Since the statute stops running with the bringing of the first indictment, a superseding indictment brought at any time while the first indictment is still validly pending, if and only if it does not broaden the charges made in the first indictment, cannot be barred by the statute of limitations.

---

4. Of course, the superseding indictment, regardless of alterations, is not time-barred if

brought within the time period allowed by the statute of limitations.

*Id.* at 601–02 (footnote omitted). The court concluded that the superseding indictment in *Grady* did not expand the charges and that therefore the indictment was not time–barred. Count 19 of that superseding indictment, in the words of the court, "simply consolidated nine counts of the superseded indictment." *Id.* at 602–03 (footnote omitted). That is what has happened in this case. Instead of five counts, one for each of the checks converted, there is one count citing those same five checks in the same five amounts. The facts alleged have not been changed, although additional underlying details have been alleged. Thus, the primary purpose of the statute of limitations is met:

> Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past.

*Toussie v. United States*, 397 U.S. 112, 114–15, 90 S.Ct. 858, 859–60, 25 L.Ed.2d 15ᵥ (1970), *quoted with approval in United States v. Marion*, 404 U.S. 307, 323, 92 S.Ct. 455, 464, 30 L.Ed.2d 468 (1971). The *Grady* rule is consistent with the purpose of a statute of limitations.[5]

We are persuaded by *Grady* and hold that a superseding indictment returned while the original indictment is validly pending is not barred by the statute of limitations if it does not expand the charges made in the initial indictment. In this case, the superseding indictment merely combines five counts into one; it does not expand the charges in the initial indictment. Therefore, we conclude that the superseding indictment is not time–barred. We thus reject Friedman's statute of limitations claim.[6]

### III.

Friedman next asserts error in the prosecution's repeated use during trial of the term "rebating." Defendant also argues that the evidence of rebating was irrelevant and highly prejudicial because it suggested illegality separate from that charged in the indictment. Friedman maintains that a new trial is required.

An insurance agent gives a rebate if he returns to an insured some or all of the insured's premium, or if he otherwise reduces the insured's premium by paying all or a portion of that premium. Pennsylva-

---

**5.** Two district courts in this circuit have followed *Grady*. *United States v. O'Neill*, 463 F.Supp. 1205 (E.D.Pa.1979); *United States v. Cerilli*, 428 F.Supp. 801 (W.D.Pa.), *aff'd on other grounds*, 558 F.2d 697 (3d Cir.), *cert. denied*, 434 U.S. 966, 98 S.Ct. 507, 54 L.Ed.2d 452 (1977).

**6.** During oral argument, Friedman raised, for the first time, a challenge to the specific wording of the superseding indictment. The statute is drafted in the disjunctive, penalizing interstate transport of checks by persons "knowing the same to have been stolen, converted *or* taken by fraud." 18 U.S.C. § 2314 (1976) (emphasis added). The superseding indictment charges, rather, in the conjunctive: "knowing the same to have been stolen, converted, *and* taken by fraud." (Emphasis added.) The use of the conjunctive, even where only the disjunctive has been proved, has been held proper. *Turner v. United States*, 396 U.S. 398, 420, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970); *United States v. Blair*, 456 F.2d 514, 518–19 (3d Cir. 1972). Further, in this case we do not need to consider this argument. The rule is that a court will not consider an issue not raised be-

fore the district court unless fundamental justice requires otherwise. *United States v. Rad-O-Lite*, 612 F.2d 740 (3d Cir. 1979); *United States v. Bazzano*, 570 F.2d 1120 (3d Cir. 1977), *cert. denied*, 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978). Fundamental justice is not violated by refusing to hear this argument because: first, the Government, the district court, and defendant, until oral argument, had proceeded as if only the disjunctive was charged; and second, the "defect" was apparent from the beginning and had the question been raised when the indictment was first returned, another indictment could have been sought.

Friedman also argues that the district court erred in refusing to dismiss the original indictment. Because the Government never proceeded against Friedman on the original indictment and because the superseding indictment violates neither the statute of limitations nor the Double Jeopardy Clause, whether the original indictment should have been dismissed need not be reached. Further, it appears that the indictment has now been dismissed without objection.

nia law prohibits "rebates and inducements." Pa.Stat.Ann. tit. 40, § 275 (Purdon 1971). Violation of the statute by an agent is a misdemeanor, punishable upon conviction by a fine of up to $1,000, or by imprisonment of up to six months, or both. *Id.* § 279 (Purdon Supp. 1980). It is also a civil offense that can result in suspension or revocation of an agent's license or a penalty of up to $1,000. *Id.*

Rebating was mentioned in the prosecution's trial brief and three times during the testimony at trial. The first instance in the trial was during the direct examination of Donald Crumpacker, a parent company manager, who explained that the company had a policy of *not* accepting premium checks on initial premiums paid by an agent or an agency. Friedman's counsel objected to the discussion on the policy of the company in general and also once as to Crumpacker's explanation of the term "rebating," objections which were overruled. At this time, there was no mention of the illegality of rebating. Later, on direct examination of William Beardslee, Sr., another insurance company executive, the Government asked if the company instructed its agents on rebating. Friedman's counsel objected, and the objection was sustained. Again, no mention was made of any illegality.

Finally, rebating was raised again during the Government's cross-examination of Friedman. Friedman, after acknowledging that he had offered the insureds "a free insurance policy," was questioned about his knowledge of rebating. Over the objections of counsel, Friedman defined the term, stated that he knew rebating was illegal and said that he offered the insureds the free insurance in order to obtain their business. When the Government asked if the latter was not rebating, a defense objection was sustained. Friedman's counsel then moved for a mistrial, a motion which was denied. This was the only testimony indicating that rebating was illegal. Friedman also argues that the judge compounded the prejudice by referring in his charge to the jury to the possibility that the sales of insurance were part of "an illegal rebate scheme."

The Government has two answers to these contentions. First, it argues that Friedman, by his defense tactics, opened himself up to the questioning on rebating. Second, it states that the judge's charge, rather than compounding any error, avoided any prejudice. Both on direct and cross-examination, Friedman admitted giving the insureds free insurance. During cross-examination of the insureds, Friedman's counsel repeatedly stressed that the insureds had never been asked to pay for the coverage. The intent of the questioning is plain: to show that the defendant was only a good man who wanted to do something for his friends, without asking anything in return.

■ The Government is correct that it could respond to this defense strategy by showing that Friedman's fine plan was contrary to company policy. Further, there was only one piece of evidence that rebating was illegal, and that came from the defendant, albeit in answer to the questioning of the Government. That the defendant knew that his conduct in offering "free" insurance might be illegal was relevant to whether that conduct was praiseworthy, as the defendant attempted to show, regardless of whether the conduct actually was illegal. The Government's question, although perhaps not the wisest, was not an improper response to the defendant's trial strategy.

The cases cited by Friedman do not require reversal in the circumstances found in this case. *In United States v. Whitmore*, 480 F.2d 1154 (D.C.Cir.1973), the prosecutor *repeatedly* referred to an affidavit and a search warrant, *not in evidence*, that identified the defendant as a seller of heroin. In argument, that prosecutor several times referred to the warrant and to the affidavit, suggesting that they indicated the defendant's guilt. Here, in contrast, Friedman has put the practice in issue by stressing that he was providing free insurance. Further, in testimony there was only a single reference to the illegality of the practice. That indicates not "a deliberate, calculated and successful effort to prejudice the defendant," *id.* at 1158, but rather "an isolat-

ed, momentary aberration occurring in the heat of trial." *Id.*[7]

*United States v. Schwartz*, 325 F.2d 355 (3d Cir. 1963), involved a prosecution for tax fraud. The defendant offered the deposition of an IRS agent who had approved the return, but was later dismissed from the Service for committing adultery. In summation, the prosecution in attacking that agent characterized his conduct as "going into hotel rooms with women when [he is] married and ha[s] kids." *Id.* at 357. There was no evidence of any such activity. The trial judge's charge to the jury was ambiguous, leaving open the possibility that the jury could consider the prosecution's statements as true. This court granted the defendant a new trial because the trial judge failed to instruct the jury to disregard the remarks for they had no bearing on the *defendant's* guilt or innocence. Here, the activity of the defendant, not a witness, is at issue and it was put in issue by the defendant.

Paramount in importance, Judge Fullam, unlike the judge in *Schwartz*, took adequate steps to correct any prejudice. He correctly noted that "[t]he argument has been made since this whole thing *may have been an illegal rebate scheme* that the policy holders had no right to the money." He then went on to say that "whether the checks were issued by mistake *or even illegally*, would have no bearing on the case." This is exactly the instruction this court found needed, but missing, in *Schwartz*. This cures and renders harmless any improperly admitted, prejudicial references to illegal rebating. Finally, as the Government notes, Friedman had the opportunity to correct or add to the judge's charge. Friedman asked for no cautionary charges. In fact, every

correction or addition he requested was granted.

The several references to rebating and the one question indicating its illegality were not improper and, at any rate, in light of the judge's instructions, were harmless. Thus, this contention is without merit. A new trial is not required.

### IV.

Friedman challenges three aspects of the sufficiency of the evidence.

### A.

First, Friedman asserts that the evidence was insufficient to support his conviction on the substantive count because the Government failed to prove that either the five payees or the insureds were entitled to the reimbursements. In part, Friedman relies on the undisputed evidence that neither the insureds, nor their wives, the payees, ever paid any money for the insurance coverage. He further bases this contention of insufficiency on the testimony of Donald Crumpacker, a manager of Lincoln National Life of Fort Wayne, that had the parent company known that none of the insureds had paid premiums, it would not have issued the checks for the reimbursements. Friedman reasons that the payees were thus not "entitled" to the reimbursement and that Friedman therefore has not converted any checks.[8]

■ Friedman's argument misses the point. In charging that the Government has not proved the payees were entitled to the funds, he ignores the facts of the case. At the time of the conversion, the payor (the insurance company) fully intended that the payees receive the proceeds of the checks. Further, nothing the payees or the

---

7. The other District of Columbia case relied on by Friedman undermines his position. In *United States v. Jenkins*, 436 F.2d 140 (D.C.Cir. 1970), the court *affirmed* a conviction despite the prosecutor's reference to the defendant as a "teenage hoodlum walking the streets of Washington," *id.* at 145, a statement much more likely to prejudice the jury than the discussion of rebating found in this case.

8. In his brief Friedman states that "it must be determined whether the evidence introduced at trial supports a finding that the policy owners had a right to or were entitled to the proceeds of the five checks in question issued by or on behalf of Lincoln National Life." He goes on to argue that Crumpacker's testimony establishes that the payees were not entitled to the proceeds and that an "essential element of conversion" was thus absent.

insureds did ever indicated that they were not entitled to the proceeds. Even Friedman, although he claims he thought the reimbursement strange, apparently thought they were entitled to the money. He called Dr. Saltz and claims he called the others about the checks. Finally, despite Friedman's argument, the presence of the payees' names on the checks should have given him notice of entitlement. Until the accounting error had been rectified, the payees were entitled to the proceeds of the checks, even though they might have been accountable for the proceeds to the payor. In such a situation, an accounting error does not preclude a person from converting funds belonging to another.

There is a second flaw in Friedman's position. Friedman, as an insurance agent, had duties to both the payees and the insurance company. Certainly he had a duty to deliver the checks that the company intended to have forwarded. If he believed that such a delivery was erroneous, he had a duty to the company to bring the matter to its attention. Instead, he cashed the checks, putting the money to his own use. Whether the payees or the insurance company were ultimately entitled to the money, Friedman, in violating duties to both and taking the money as his own, converted funds belonging to another.

### B.

Next Friedman argues the evidence was insufficient to prove that he was not entitled to the checks. At trial, Friedman testified that the insureds, the husbands of the payees, had each authorized Friedman to keep the money. On appeal, he now argues that the Government never rebutted that testimony and that therefore he was entitled to an acquittal, because the evidence fails to prove Friedman's guilt beyond a reasonable doubt. Specifically, Friedman argues, the Government did not, but should have asked each of the insureds whether he had authorized Friedman to cash the check and keep the money.[9]

Reviewing the record, we conclude that the testimony is sufficient to support a jury decision to disbelieve Friedman's story. All the payees—the wives—denied signing the checks or authorizing anyone to sign them. Similarly, each husband denied such authorization, or denied knowledge of the checks, or denied having any discussions about the checks.[10] In sum, the Government presented sufficient evidence to rebut Friedman's story that he had received authorization.

### C.

The jury convicted Friedman of violating 18 U.S.C. § 371 (1976) by conspiring with Stanley Sabolsky, a Mindep agent, to convert the funds sent to the insureds' wives by the company as reimbursement. Finally, Friedman argues that the evidence was insufficient to support the conspiracy conviction.[11] Friedman's review of the evidence, however, is too narrow and several of the conclusions he draws from the evidence are skewed. In an appeal from a conviction for conspiracy, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62

---

9. Friedman, in his brief, maintains that "the Prosecution failed to prove that the Appellant was not authorized by the insureds to keep the checks." This position, of course, is inconsistent with his previous contention, for if neither the insureds nor the payees were entitled to the proceeds, they could not have had the legal right to authorize Friedman to keep the money.

10. Friedman's counsel once observed in making an objection that a husband "can't authorize anybody to sign his wife's name." Friedman's actions might still constitute conversion, even if the husbands had authorized the endorsements.

11. Friedman, in contesting the sufficiency of the evidence on the conspiracy charge, asserts that the charge to the jury "did not sufficiently bring into focus" the relevant evidence. Although spare, the charge did properly explain the two elements of the offense of conspiracy. *See United States v. Falcone*, 311 U.S. 205, 210, 61 S.Ct. 204, 206, 85 L.Ed. 128 (1940). Moreover, following his charge to the jury, Judge Fullam solicited corrections and additions, and complied with all requests made by Friedman. Friedman cannot now complain about the charge.

S.Ct. 457, 86 L.Ed. 680 (1942). Yet the close relationship between Friedman and Sabolsky, without more, does not prove a conspiracy. *United States v. Palacios*, 556 F.2d 1359, 1365 (5th Cir. 1977).

The evidence, according to Friedman, shows that Sabolsky was licensed to write insurance for Lincoln of New York; that he had approved and forwarded the policy applications of the six; that he had approved the non-recourse loan notes executed by the six in order to obtain premium-free insurance the first year; and that he was Friedman's conduit to the insurance company. At the least this indicates that Sabolsky was necessary to Friedman's selling of insurance to the insureds, and that he knew they paid no premiums on that insurance.

Friedman, in his brief to this court, also acknowledges that Sabolsky took part in the arrangements to reissue policies of the six. Further, a Government witness, William Beardslee, Sr., testified that he had delivered at least three, and possibly all five, of the reimbursement checks in issue to Sabolsky. Thus Sabolsky knew of the intended reimbursement and its cause. Having processed the initial policies, he knew no premiums had been paid. Thus, the jury could infer that Sabolsky knew that Lincoln was erroneously reimbursing the insureds, that the insureds were not expecting any money, and that the company would lose money as a result of that reimbursement. Yet Sabolsky apparently took no steps to correct the error which must have been plain to him. In fact, Sabolsky was in the best position to profit from the error, because he alone knew the specifics of the issuance of the first policies, of the reissuance, and of the resulting reimbursement.

Finally, it is undisputed that Sabolsky promptly received $5,000 from Friedman, money derived by Friedman only by his cashing of the five checks. That this payment was allegedly in repayment of a loan due Sabolsky does not require a conclusion that Sabolsky did not profit. Under *Glasser*, such an inference, in favor of the defendant, need not be drawn. Moreover, regardless of the so-called "debt," Sabolsky would not have received any cash *at that time* from Friedman, who previously had no bank accounts, without Friedman's conversion of those funds.

These facts are sufficient to support the conviction on the conspiracy charge. The jury could have inferred that Sabolsky knew of the erroneous reimbursement intended for insureds who expected none, having paid no premiums. He had a duty to the company to correct the situation, yet he did not. Instead, he exploited the error by forwarding the checks to Friedman who succeeded in cashing them, ultimately giving $5,000 of the proceeds to Sabolsky. Sabolsky must have known that conditions existed favorable to the scheme. In furtherance of the plan, two actions can be attributed to him: First, he violated duties as an agent to Lincoln of New York by not rectifying an obvious error, and in so doing he permitted Friedman to proceed with the plan. Second, he delivered some if not all of the checks, the instruments converted, to Friedman. Finally, he profited from the scheme, receiving $5,000 that he would not have received at that time, if ever, even if the money were actually owing. This contention of error, like defendant's others, is without merit.

The judgment of conviction will be affirmed.