**UNITED STATES of America, Plaintiff,**

**v.**

**John R. LYTLE, William G. Patterson and Jere A. Sturgis, Defendants.**

**No. 87 CR 135.**

United States District Court,
N.D. Illinois, E.D.

Jan. 27, 1988.

Anton R. Valukas, U.S. Atty., Joseph J. Duffy, Ted S. Helwig, Mark L. Rotert, Asst. U.S. Attys., Chicago, Ill., for U.S.

John Powers Crowley, James R. Streicker, Mathew F. Kennelly; Cotsirilos, Crowley, Stephenson, Tighe & Streicker, Chicago, Ill., for Lytle.

William T. Huyck, Chicago, Ill., for Sturgis.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

John Lytle ("Lytle"), William Patterson ("Patterson") and Jere Sturgis ("Sturgis") have been indicted five times (!) under the federal wire fraud and misapplication of bank funds statutes, 18 U.S.C. §§ 1343 ("Section 1343") and 656, for alleged schemes to defraud Continental Illinois National Bank ("Continental").[1] Lytle and Sturgis have now moved to dismiss the fourth and fifth indictments (the first three having already been disposed of) on a variety of grounds.[2] Lytle has also moved alternatively (1) to dismiss the fifth indictment for vagueness and (2) for a bill of particulars. For the reasons stated in this memorandum opinion and order, the fourth indictment (the "March Indictment") will be dismissed (but not now), the fifth indictment (the "August Indictment") will not be dismissed, the portion of the August Indictment alleging wire fraud under the so-called "intangible rights" theory is stricken, and a limited bill of particulars is granted.

### Procedural Background

Defendants were first indicted September 25, 1984 in Case No. 84 CR 726, assigned to this Court's colleague Honorable John Grady. Patterson sought dismissal of the indictment on double jeopardy and other grounds. After Judge Grady had denied that motion in its entirety, our Court of Appeals (782 F.2d 68 (7th Cir.1986)) held the collateral estoppel branch of Patterson's double jeopardy claim could be addressed only through a review of the evidence at his earlier Oklahoma trial.[3]

Before Judge Grady could implement the Court of Appeals' mandate, he became Chief Judge of our District Court and the case was reassigned to this Court's calendar. This Court's review of the file disclosed a lurking (and inadvertent) Speedy Trial Act problem not previously identified by either Judge Grady or the litigants. That compelled the dismissal of the indictment on July 17, 1986—but given the unintended nature of the statutory violation, this Court exercised its discretion by ordering dismissal without prejudice (see 18 U.S.C. § 3162(a)(2)).

On November 24, 1986 a new indictment (86 CR 847) was returned by the Special December 1983 Grand Jury. But because that "indictment" turned out to have been issued by a grand jury that—its statutory term having expired—was no longer authorized to conduct business, it too had to be dismissed—again without prejudice (see Appendices to *United States v. Lytle*, 658 F.Supp. 1321, 1328, 1330 (N.D.Ill.1987)).

On March 3, 1987 the government then obtained the March Indictment[4] from the Special December 1986 Grand Jury.[5] By that time the statute of limitations had run on some of the counts, and this Court accordingly dismissed those counts (658 F.Supp. at 1325).

On June 24, 1987 *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97

1. Patterson has also been indicted, tried and found not guilty in the Western District of Oklahoma on related charges that he engaged in a scheme to defraud the Penn Square Bank ("Penn Square"). Those charges were not, however, sufficiently related to insulate him from the current prosecution (see the Court of Appeals' per curiam decision at 827 F.2d 184 (7th Cir.1987), affirming this Court's denial of Patterson's motion to dismiss the indictment on collateral estoppel grounds).

2. Patterson has not joined in these motions. Nonetheless he gains as a "third-party beneficiary" of the motions because this opinion (1) strikes a part of the fifth indictment that charges him as well and (2) orders the government to furnish defendants some further particulars.

3. In the meantime the original indictment had been superseded in December 1985, but the same legal principles remained operative as to the new indictment.

4. Allegations in the March Indictment will be cited "March ¶ —."

5. Because the prior indictments (and the grand juries returning them) are no longer relevant for present purposes, the Special December 1986 Grand Jury will hereafter be referred to simply as the "Grand Jury."

L.Ed.2d 292 (1987) limited the scope of the federal mail fraud statute, 18 U.S.C. § 1341 ("Section 1341"), in turn casting doubt on whether some of the counts in the March Indictment had validly alleged violations of Section 1343.[6] Rather than merely striking the questionable portions, on August 31, 1987 the government returned to the Grand Jury and obtained what it labels the "superseding" August Indictment.[7]

### Defendants' Arguments

Lytle and Sturgis say both the March and August Indictments must be dismissed. Their primary contention is that the differences between the March and August Indictments are so substantial as to require two conclusions:

> 1. By returning the later indictment the grand jury repudiated the March Indictment, so trying defendants under it would violate either or both of the Grand Jury and Due Process Clauses.

> 2. Because the August Indictment does not truly supersede the March Indictment, the statute of limitations was not tolled during its pendency and has now run, barring any prosecution.

If those arguments succeed, no more is needed. If either or both fail, defendants advance several fallback positions:

> 1. Various counts in the March Indictment and the corresponding counts in the August Indictment do not state violations of Section 1343 because they allege fraud under the intangible rights theory.

> 2. In the August Indictment, the allegations supporting the non-intangible-rights counts do not include all elements of the crimes charged.

> 3. Finally as to the August Indictment, it was not returned by an independent and informed grand jury.

Of course the United States disputes each of defendants' contentions.

---

**6.** Sections 1343 and 1341 have always been treated as differing only in the instrumentality of commerce used. There is no question the *McNally* doctrine applies with equal force to Section 1343 (*Carpenter v. United States,* — U.S. ——, 108 S.Ct. 316, 320 n. 6, 98 L.Ed.2d 275 (1987)).

**7.** Allegations in the August Indictment will be cited "August ¶ —."

### Basic Allegations [8]

Lytle was employed as Vice President in charge of Continental's Mid–Continent Division (March ¶ 5; August ¶ 5). As such he supervised Continental's lending activities for energy development in an area including Oklahoma (March ¶¶ 8–10; August ¶¶ 9–12). Patterson was Vice President in charge of Penn Square's Oil and Gas Division, as well as a director and stockholder of Penn Square's parent First Penn Corporation (March ¶¶ 2, 6, 7; August ¶¶ 2, 6, 7).

Continental and Penn Square entered into participation agreements under which Continental purchased loans (or portions of loans) Penn Square had made to its customers (March ¶ 39, 40; August ¶ 18). Sturgis and entities he controlled were borrowers from Penn Square.

#### 1. Lytle and Patterson

Both indictments allege Lytle and Patterson engaged in a series of transactions from July 1980 through July 1982. Lytle is supposed to have approved a series of loans to Penn Square's customers in violation of Continental's lending policies and prudent banking practices, while Patterson is alleged to have arranged personal loans to Lytle from Penn Square on favorable terms and to have provided other benefits to Lytle.

March ¶ 43 alleges Lytle and Patterson entered into a scheme to defraud Continental that lasted from July 1980 through July 1982. As part of that scheme Patterson is alleged to have approved nine "unsecured loans totalling $585,000, at favorable interest rates" to Lytle (March ¶ 45). Patterson is also charged with (1) obtaining a $565,000 loan for Lytle from Community Bank of Oklahoma ("Community") to help Lytle pay the Penn Square loans, (2) personally paying over $40,000 in interest for Lytle,

---

**8.** Needless to say, this opinion is not concerned with the truth or falsity of any factual allegation in either indictment. Instead the issue is whether the facts as alleged constitute violations of the relevant statutes. Accordingly the textual statement is drawn from what the government has charged and implies nothing as to what the evidence will or will not reveal at trial.

(3) attempting to conceal that payment and (4) obtaining a $150,000 line of credit for Lytle at the Bank of Healdton ("Healdton") in Oklahoma (March ¶¶ 46–52).

August ¶ 18 alleges Lytle and Patterson engaged in a scheme to defraud Continental that began in July 1981. In keeping with the later date of inception, the indictment charges Patterson approved only four loans to Lytle totalling $385,000 as a part of the scheme (August ¶ 22A). Nevertheless August ¶ 21A alleges the other five loans, without asserting they were approved as part of the scheme. August ¶ 24A also charges Patterson's payment of interest on Lytle's loans and the transactions with Community and Healdton, although the Healdton transaction is called a loan rather than a line of credit.

On the other side (whether "quid" or "quo") of the scheme, the March Indictment charges Lytle with approving a series of 15 specific loans totalling almost $90 million from Continental to Penn Square in violation of Continental's procedures or prudent lending practices (March ¶¶ 69–83). In each instance the indictment specifies not only the amount and recipient of each loan but also the Continental policy Lytle is alleged to have violated (*id.*). August ¶¶ 22D and 24C allege only that Lytle approved 12 loans totalling $44 million in violation of Continental's policies and prudent banking practices. In addition to charging three fewer loans, the indictment reduces the value of several of the loans.[9] Finally, the August Indictment does not specify the Continental policy or prudent practice Lytle is alleged to have violated in approving the individual loans.

Based on its factual allegations the March Indictment charged Lytle and Patterson with (March ¶ 43):

a scheme to defraud Continental Bank and its shareholders and customers of:

(a) their right to the conscientious, loyal, honest, faithful and impartial services, decisions, actions and performance of duties by defendant JOHN R. LYTLE in his capacity as head of the Mid–Continent Division, free from misconduct, fraud, and conflict of interest, and concealment of material facts; and

(b) their right to have the bank's business affairs conducted honestly, impartially, and free from misconduct, fraud, conflict of interest, and concealment of material facts by their employee, the defendant JOHN R. LYTLE; and

(c) money in the form of loans to customers of the Penn Square Bank.

Counts 1 through 11 of the indictment[10] then alleged 11 separate telephone or wire communications in furtherance of that scheme in violation of Section 1343. Counts 12 through 16 charge misapplication arising from five of the loans.

August ¶ 18 recast the alleged scheme as one to:

defraud Continental Bank and its shareholders and customers of:

(a) their right to the conscientious, loyal, honest, faithful and impartial services, decisions, actions and performance of duties by their agent defendant JOHN R. LYTLE in his capacity as head of the Mid–Continent Division, free from misconduct, fraud, and conflict of interest, and concealment of material facts, which right was a property interest in the amount of Lytle's salary and other employee benefits as well as other economic benefits he received as a result of his employment with Continental Bank; and

(b) money in the form of loans to customers of the Penn Square Bank.

Counts 1 through 8 of the indictment then alleged eight separate telephone or wire communications in furtherance of that scheme in violation of Section 1343. Counts 9 through 11 charged misapplication arising from three of the loans.

---

9. For example, the amount of the loan to Texoma Resources, Inc. is reduced from $12 million to $3.2 million, while that to Longhorn Oil and Gas is reduced from $22 million to $11.64 million (March ¶¶ 69, 70; August ¶ 22D).

10. In fact the style of indictments returned in this District is to designate different counts in words (e.g., Count One), not numbers (e.g., Count 1). For ease in reference this opinion will use numbers.

### 2. Sturgis

Sturgis and several entities under his control are alleged to have been borrowers from Penn Square. However, none of the loans charged as having been improperly approved by Lytle ran to Sturgis or his entities. Consequently, while March ¶ 43 and August ¶ 18 allege Sturgis participated in the schemes just laid out, he is charged with just two counts of wire fraud for communications linked to his involvement. Specifically the March Indictment alleges Sturgis was involved with Lytle and Patterson in attempts to obtain Continental loans for Sturgis in return for his repurchase of Lytle's investment in the Cheyenne Exploration Corporation ("Cheyenne") for substantially more than defendants knew that investment to be worth (March ¶ 56–60, 86). That same involvement on Sturgis' part is alleged in more general terms in August ¶¶ 25 and 26.

### *August Indictment and the Statute of Limitations*

Each act charged against each defendant in the August Indictment is alleged to have occurred more than five years before that indictment was returned. Thus 18 U.S.C. § 3282 would bar prosecution for those acts unless the pendency of the March Indictment tolled the limitations period. Lytle and Sturgis acknowledge a true "superseding" indictment [11] is generally not barred by limitations (e.g., *United States v. Friedman,* 649 F.2d 199, 203–04 (3d Cir. 1981)), but they contend the August Indictment is so different from the March Indictment that the earlier one cannot be treated as tolling the statute of limitations.

All parties agree an earlier indictment tolls the statute of limitations if the superseding indictment "does not broaden or substantially amend the original charges" (*United States v. Gengo,* 808 F.2d 1, 3 (2d Cir.1986)).[12] Unfortunately that verbal formulation provides little guidance, and the cases most often do little more than state their conclusions as to whether or not particular superseding indictments fit that description, without describing in sufficient detail the differences between the earlier and later indictments that underlie those conclusions. What *is* clear is that a court should look to the purpose of the statute of limitations—providing notice to a defendant within the limitations period—to determine whether the initial indictment tolls the statute. As *Gengo, id.* at 3 put it:

> [N]otice is the touchstone in deciding whether a superseding indictment substantially changes the original charges.

For that purpose the issue is whether the first indictment adequately "apprise[d] a defendant 'that [he] will be called to account for [his] activities and should prepare a defense'" (*id.* at 3, quoting *Grady,* 544 F.2d at 601).

Without question the August Indictment substantially recasts the allegations contained in the March Indictment. Its organizational structure is changed dramatically, and the specific words chosen to frame various allegations often change as well. Yet those things, primarily changes in form rather than substance, do not undercut the notice provided by the earlier indictment (see *Grady,* 544 F.2d at 602). Substantively each of the August Indictment counts

---

11. Despite the universal use of the "superseding" label, no statutory recognition of the concept exists (see *United States v. Rojas–Contreras,* 474 U.S. 231, 237, 106 S.Ct. 555, 559, 88 L.Ed.2d 537 (1985) (Blackmun, J., concurring)). However, there is no disagreement on the relevant principles discussed in the text, so this opinion's adherence to the practice is convenient and creates no possibility of confusion.

12. Citing language in *United States v. Snowden,* 770 F.2d 393, 398 (4th Cir.), *cert. denied,* 474 U.S. 1011, 106 S.Ct. 540, 88 L.Ed.2d 470 (1985), Lytle suggests only "trivial or innocuous" changes in factual allegations are permissible. But *Snowden* cannot fairly be read as establish-

ing such a standard. True enough, the opinion described the specific changes there in those terms, but it did not at all suggest that language marked the outer limits of the government's ability to change the factual allegations in a superseding indictment. Instead *Snowden* cited (as its only authorities) *Friedman,* 649 F.2d at 203 and *United States v. Grady,* 544 F.2d 598, 602–03 (2d Cir.1976), both of which apply the "broaden or substantially amend" standard. While none of the parties has cited (and this Court's research has not found) any case on point from our Court of Appeals, the Circuits that have addressed the issue are unanimous in applying that standard.

corresponds to a count in the March Indictment.[13] No charge is "broadened" in the sense that new time-barred crimes are alleged. Yet Lytle urges the revisions in the underlying factual allegations are substantial. Each of the changes he stresses must be addressed at least briefly.

### 1. Nature and Duration of the Scheme

■ As quoted earlier, the scheme to defraud alleged in August ¶ 18 drops the "pure" intangible rights theory of March ¶ 43(b) and realleges verbatim the "pure" property theory of March ¶ 43(c). All that is added to August ¶ 18(a) is language characterizing Continental's interest in Lytle's services as a property right. As explained later under "Sufficiency of the Wire Fraud Charges," that change is of no consequence.

As already stated, August ¶ 18 also alleges a scheme beginning in July 1981 rather than in 1980. That change conforms to the elimination of the time-barred charges from the March Indictment. It presents no conceivable threat to Lytle's interest in receiving notice of the charges against him.

### 2. Lytle's Duties

■ Unlike the March Indictment, August ¶ 11 specifically charges Lytle with a duty to disclose to Continental material information regarding his performance. According to the government that is not a new allegation. It points to March ¶ 43(a)'s invocation of Continental's right to be free from "concealment of material facts." Lytle correctly counters that the common law has long found legal significance in the difference between active concealment and the failure to disclose material information. Lytle says the change affects him adversely because he must now defend against the broader charge of mere silence.

All the same, Lytle's challenge must fail. Certainly the March Indictment placed him on notice that he was to be held accountable for his performance as a Continental lending officer as to specifically identified transactions. That notice was within the limitations period, and Lytle has surely known he had to preserve evidence and prepare his defense in that respect. And while the legal charge that he failed to disclose information is not identical to a charge that he concealed that information, the factual basis for any defenses he may have to either charge *is* identical.

### 3. Quid Pro Quo

■ March ¶ 44 alleged Lytle would fund loans and in return would receive economic benefits through Patterson. August ¶ 19 alleges instead that Patterson and Sturgis conferred benefits on Lytle and as a result Lytle funded loans. Lytle Mem. 6 asserts "the Government's theory has changed from 'Patterson rewarded him' to 'Patterson softened him up.'" That distinction (even if it exists, which is not at all clear) simply would not be material. Both indictments allege a "you scratch my back and I'll scratch yours" scheme. To mix metaphors, it really does not matter which was the chicken and which the egg. Indeed, the government points out the different locution in the two indictments is simply a function of the shorter time period the August Indictment states for the scheme—a revision caused by this Court's ruling outlawing certain of the earlier counts as time-barred. There has been no change in the timing of the benefits Lytle is alleged to have received.

In sum, Lytle has not suggested any way in which the asserted change deprived him of notice of the charges against him. Each of the underlying factual allegations is the same.

### 4. Replacement of Specific Language with General Language

■ Frequently the August Indictment replaces specific allegations with more general terms. For example, March ¶ 45 alleged the Penn loans to Lytle were "unsecured" and "at favorable interest rates," while August ¶¶ 21A and 22A simply allege they were "on favorable terms." Similarly, each of the March allegations as to the Continental loans that Lytle approved de-

---

**13.** Five counts were dropped from the March Indictment: four counts this Court had previously held barred by the statute of limitations and one count not time-barred. Of course defendants do not object to that aspect of the August Indictment.

scribes the alleged violation of Continental policy, such as failing to assess the creditworthiness of a borrower or ignoring the reports of petroleum engineers. August ¶¶ 22D and 24C merely say the loans were made "without regard to prudent banking practices and Continental lending policies and procedures."

Lytle contends the August Indictment, by allowing the government to convict him based on evidence of "imprudent banking practices" or "favorable loan terms" not specifically alleged in the original indictment, impermissibly broadens the charges against him. But that argument rests on the implicit assumption that revised language in a superseding indictment should be judged by the same standard as when proof at trial varies from the indictment (in the latter respect see, e.g., *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960)).[14] And Lytle offers no real authority for that assumption.[15]

■ When a court either "amends" an indictment or allows the government to present evidence that materially differs from the indictment, the constitutional right to indictment by a grand jury is violated and a conviction cannot stand (*Stirone, id.* at 215–19, 80 S.Ct. at 272–74). No such constitutional guaranty is at stake here, for the August Indictment was returned by a validly constituted grand jury. By contrast, Lytle asserts a statutory right, the fundamental purpose of which is to provide him with notice of the charges against him within the limitations period. If that purpose was served by the March Indictment, Lytle's rights are not infringed.

On that score the March Indictment clearly put Lytle on notice that his conduct as to the specified loans from Penn Square and as to the Continental loans he approved would be at issue. Inclusion of more general descriptive language in the August Indictment does not broaden or substantially change the earlier indictment.[16]

5. Discovery and Concealment

■ August ¶ 23 alleges Continental became aware of Lytle's loans from Penn Square and "advised" him to sever his relationship with that bank. There was no corresponding allegation in the March Indictment.

Lytle says the new allegation broadens the indictment because, when combined with the allegations of Lytle's and Patterson's efforts to conceal the benefits Lytle received after their relationship was discovered, the effect is to charge Lytle with disobeying an order of the bank, and with a "separate, and potentially more significant scheme ... to circumvent the order from Lytle's superiors" (Lytle R.Mem. 6). In response the government says the new allegation is merely an evidentiary detail, and each affirmative act of concealment of the benefits Lytle was receiving is alleged in the March Indictment.

In realistic rather than hypertechnical terms, the additional allegation adds little to the indictment.[17] March ¶ 9 (like August ¶ 10) specifically alleges Lytle's fiduciary duty "to conduct his personal and profes-

---

**14.** At this point it is assumed, solely for the sake of discussion, that the August Indictment would allow the government to produce evidence at trial that would have been barred by *Stirone* and its progeny under the March Indictment.

**15.** *Grady,* 544 F.2d at 602 does note the court is "guided to some extent" by such cases, which is unsurprising given the general similarity of the two situations.

**16.** Neither any party nor this Court has located any case legally similar to this one. Perhaps the closest is *United States v. Chagra,* 638 F.Supp. 1389, 1394–95 (W.D.Tex.), *aff'd on other grounds,* 807 F.2d 398 (5th Cir.1986), *cert. denied,* — U.S. —, 108 S.Ct. 106, 98 L.Ed.2d 66 (1987)), where a superseding indictment for conspiracy to murder a federal judge both omit-

ted some overt acts from the original indictment and alleged some not previously included. That superseding indictment was held not time-barred. See also *United States v. Panebianco,* 543 F.2d 447, 454 (2d Cir.1976), *cert. denied sub nom. Anatala v. United States,* 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977) (superseding indictment added only "some more overt acts").

**17.** This conclusion is reached irrespective of the determination made later in this opinion as to the nature of the alleged mail fraud scheme. Whether or not August ¶ 18(a) is read to allege a scheme to defraud Continental of Lytle's salary as such, Continental's discovery and Lytle's alleged later concealment of the Penn Square loans do not go so far afield of the March Indictment's allegations as to represent a substantial amendment.

sional affairs so as to avoid any direct or apparent conflict with the interests of Continental Bank." March ¶ 43 charged the scheme to defraud sought to deprive Continental of its right to have that duty honored. And March ¶ 44 asserted Lytle's receipt of "substantial economic benefits" (an obvious breach of that duty), with Lytle in turn selling Continental's best interests down the river. Lytle adduces no authority for the proposition that an indictment must plead all the government's evidence in support of its charging allegations—or the related proposition that if some such evidence is pleaded, *all* of it must be. Surely the government would not have been foreclosed from proving what August ¶ 23 now alleges had this case gone to trial on the March Indictment.

To cast the same thought in slightly different terms, the new factual allegation is closely linked to the events alleged in the March Indictment. At a minimum it surely arises out of "approximately the same facts" as those alleged there (*United States v. Charnay*, 537 F.2d 341, 354 (9th Cir.), *cert. denied sub nom. Davis v. United States*, 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976), quoting *Mende v. United States*, 282 F.2d 881, 883–84 (9th Cir. 1960), *cert. denied*, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365 (1961)).[18]

6. Sturgis' Involvement

■ Lytle says the August Indictment makes three new allegations about his relationship with Sturgis:

1. that Sturgis repurchased the Cheyenne investment "so that" Lytle would approve loans from Continental;

2. that defendants used a nominee for the repurchase of the Cheyenne investment and

3. that Sturgis tried to get loans from Continental before March 1982.

None of those objections amounts to much (if anything).

As for the first, the unmistakable import of March ¶¶ 56 and 86 is a causal link between the repurchase and the attempt to obtain loans from Continental. Moreover, March ¶ 44 alleges in general terms a link between benefits to Lytle and loans from Continental to Penn Square customers. There is simply nothing new here.

Second, the term "nominee" to describe the use of Frank Creamer and Petro Industries to effectuate the repurchase merely attaches a label to allegations fully spelled out in March ¶¶ 57–60. Again the "change" is nonsubstantive.

Finally, even if March ¶ 86 is read to exclude pre-March 1982 efforts to obtain a loan for Sturgis, the additional detail is insignificant. Without question Lytle had already been placed on notice by the March Indictment that his relationship with Sturgis will be at issue.

\* \* \*

That covers the entire set of limitations-oriented arguments. All in all, it simply cannot be said that the August Indictment so differs from the March Indictment that Lytle was not placed on notice of the charges against him by the earlier indictment. Accordingly the statute of limitations was tolled.

### Independence of the Grand Jury

■ Lytle maintains the Grand Jury that returned the August Indictment (the same one that had returned the March Indictment) was not "independent and informed" as required by the Fifth Amendment (*Wood v. Georgia*, 370 U.S. 375, 390, 82 S.Ct. 1364, 1373, 8 L.Ed.2d 569 (1962)). Lytle does not claim the Grand Jury was not independent and informed in March, but rather that the Assistant United States Attorney who presented the new indictment in August misled the jurors as to both the reasons for and nature of the changes the government had made.[19]

---

**18.** Lytle also says August ¶ 20 "broadens" the concealment charge against him because it refers to "the full nature and extent of defendant Lytle's financial dealings with and continuing financial dependence on defendant Patterson, [Penn Square] and its customer," while March ¶ 46 refers only to the Penn Square loans. But

March ¶ 87 is certainly broad enough to encompass the language of August ¶ 20. It says:

It was further a part of the scheme to defraud that the defendants would conceal the means and object of their scheme.

**19.** As the Grand Jury transcript reflects, the Grand Jury decided not to hear new evidence

In presenting the August Indictment the Assistant United States Attorney told the grand jury (1) he was returning to obtain a new indictment because of the Supreme Court's *McNally* decision and (2) the new indictment merely removed some allegations to conform to *McNally*. In addition he made the cryptic comment that the new indictment "will contain no new information, and if it does, I'll explain that new information to you." Lytle objects to all those characterizations.

As this opinion has shown, that set of comments was not really accurate, even in summary terms. True enough, some deletions were made in the attempt to conform to *McNally*. But the indictment was also completely rewritten, and most of those changes had nothing to do with *McNally*. However, this Court has already concluded the changes were matters of form rather than substance, so the fact the government did not highlight its restructuring of the indictment hardly suggests the Grand Jury failed to perform its proper function. It is clear from the Grand Jury transcript that the Grand Jury reviewed the new indictment and asked questions about various of its allegations. And when the Assistant United States Attorney departed he left the new indictment with the Grand Jury, whose deliberations proceeded from there on their own. This record does not pose the kind of prosecutorial misconduct that taints the deliberative process.

This opinion does confirm that the August Indictment contains some non-trivial new information. In particular, August ¶ 23 charges Continental discovered Lytle's loans from Penn and told him to sever the relationship. That allegation, however, was specifically mentioned by the FBI agent before the Grand Jury in August. No other significant changes were made other than the government's attempts to conform its scheme-to-defraud allegations to *McNally*. That change was also specifi-

cally discussed, and this opinion will later explain why it is to be stricken in any case.

In sum, this Court's review of the August 1987 grand jury proceedings suggests no basis for a conclusion the that Grand Jury was impermissibly misled. It has not been shown to have been other than "independent and informed."

### Repudiation of March Indictment

 Lytle's contention that the Grand Jury implicitly repudiated the March Indictment by returning the August Indictment is, at the least, novel.[20] Fortunately it is mooted by the earlier-reached conclusion that the August Indictment is not time-barred. G.Mem. 13 says the "government will proceed to trial on the August indictment and will dismiss the March indictment." Because this Court has held defendants may be tried under the August Indictment, the government can and will be held to its word.

Just a word is in order as to the appropriate timing for dismissal of the March Indictment. That dismissal is necessarily predicated on the viability of the August Indictment. To dismiss the earlier indictment now could promote the taking of piecemeal appeals, if only to protect against all the contingencies. All of what is said here would be mooted by an acquittal at trial, and even a conviction (depending on its scope) could shape the continued relevance (if any) of dismissal of the March Indictment. Accordingly this Court will content itself with announcing now its firm resolve to require trial on the August Indictment, anticipating dismissal of the March Indictment when the entire case can be concluded at once.

---

before returning the August Indictment. However, it had available a transcript of the testimony it had received in March. There is nothing improper in the Grand Jury deciding not to take additional live evidence (*United States v. Flomenhoft*, 714 F.2d 708, 711–12 (7th Cir.1983), *cert. denied*, 465 U.S. 1068, 104 S.Ct. 1420, 79 L.Ed.2d 745 (1984)).

**20.** Lytle cites no authority holding (1) a grand jury can implicitly repudiate an earlier indictment or (2) either the Due Process or Grand Jury Clause would be violated by the government's proceeding to trial under a "superseded" indictment. Indeed, his entire argument consists of seeking to distinguish cases that appear to hold otherwise.

*Sufficiency of the Wire Fraud Charges*

1. Intangible Rights or Property Rights [21]

 *McNally* held a person could not be convicted under Section 1341 on the basis of an indictment that charged only a scheme to defraud the government and its citizens of their right to governmental affairs "conducted honestly, impartially, free from corruption, bias, dishonesty, deceit, official misconduct, and fraud" (107 S.Ct. at 2878 n. 4). At issue here is whether the *McNally* doctrine would preclude conviction under previously-quoted August ¶ 18(a).

One possible reading of August ¶ 18(a) is that it alleges a scheme to deprive Continental of Lytle's salary and fringe benefits by his accepting those benefits while secretly withholding his honest services. And perhaps (though this Court need not decide the question) that might charge a violation of Section 1343—Lytle's salary is of course money, and Section 1343 proscribes schemes to defraud of "money or property." Indeed, G.Mem. 20–21 seems to suggest that is the government's theory.

In all candor, however, that has to be viewed as an extraordinarily strained reading of the charged scheme. Nowhere is the amount of Lytle's salary ever mentioned, nor is any defendant charged with the intent—an essential element of the crime—to defraud Continental of that salary as such. Instead the indictment stress-

es Lytle's fiduciary obligations to Continental, and the government's memoranda argue at length that Continental's right to Lytle's faithful services [22] constitutes "property" and his salary is merely "the measure, the way of assigning value to this property right" (G.Mem. 23–24). This Court rejects the characterization of the charged scheme as one to deprive Continental of Lytle's salary as such as being a fair construction of August ¶ 18(a). [23]

Under a more natural reading of August ¶ 18(a), the language it adds (beginning "which right was a property interest ...") is merely a characterization of the right already described in the August Indictment: Continental's right to Lytle's faithful services. If that is indeed a property right under *McNally*, its characterization as a property right in the indictment is surplusage. If however it is not a property right under *McNally*, the Grand Jury cannot transform it into one by attaching a label. Thus the question is whether a scheme to deprive an employer of an employee's faithful services is encompassed by Section 1343.

Since *McNally*, dicta from both the Supreme Court and our Court of Appeals have suggested an employer's right to its employees' faithful services is "an interest too ethereal in itself to fall within the protection of the mail fraud statute" (*Carpen-*

**21.** As this Court has suggested elsewhere, "intangible rights" and "property rights" are oddly-chosen terms for any effort to divide up the universe of "rights" into mutually exclusive and all-inclusive subsets (see *United States v. Gill*, 673 F.Supp. 275, 281 & n. 8 (N.D.Ill.1987)). After all, "money" is really a classic example of an intangible: In analytic terms, it is nothing more than evidence of the right to receive something of value. It is doubtful that Sections 1341 and 1343 were drafted thoughtlessly when they referred to "money *or* property" as a dichotomy and not as a lesser term encompassed within the greater. What has really caused the current problem is that, because the doctrine rejected in *McNally* had come to be known as the "intangible rights" doctrine in the many lower court cases embracing it, the *McNally* majority felt compelled to set off "intangible rights" as somehow *different* from "money or property"—that is, as different from both "money" *and* "property." Hence the imprecision of the "intangible rights" label has triggered much of the post-*McNally* conceptual difficulty in this area. Jus-

tice Stevens' *McNally* dissent used the expansive range of that concept (107 S.Ct. at 2882–85 and associated footnotes) to score some of its most telling arguments. And our Court of Appeals, for example, has pointed to the same post-*McNally* fuzziness of the "intangible rights" notion in *Wellman*, 830 F.2d 1453, 1462 (7th Cir. 1987).

**22.** This opinion will use the shorthand term "faithful services" for the longer formulation in August ¶ 18(a).

**23.** To avoid misunderstanding, it should be said at this point that even the different reading urged by the government is inextricably linked to the "faithful services" concept. If Lytle had to disgorge his salary and fringe benefits, that could only be so because his faithlessness to his employer caused that result as an extension of the "secret profits" principle. In this Court's view, then, the charge would stand or fall on the principles next discussed in the text.

*ter,* 108 S.Ct. at 320; *United States v. Wellman,* 830 F.2d 1453, 1462 (7th Cir. 1987) (suggesting an employee's violation of fiduciary duties by accepting kickbacks would fall outside the statute); *United States v. Gimbel,* 830 F.2d 621, 626 (7th Cir.1987) (suggesting the right to "honest and loyal services" is no longer within the statute)). Nonetheless it must be acknowledged those statements were not necessary to any of the decisions reached and are therefore not controlling (see generally *United States v. Crawley,* 837 F.2d 291 (7th Cir.1988)). Hence this opinion must treat with the government's contentions on their own terms.[24]

Although the government has offered a moving rather than a stationary target, its theory for treating Continental's interest in Lytle's faithful services as a property right seems to be this:[25] Lytle had a fiduciary duty to Continental to disclose material information such as his loans from Penn Square, and breach of that duty was common law fraud. Because Continental has a right at common law to recover either Lytle's salary or the secret profits he received, that represents a property right. At times the government also refers to Continental's "right to control its employees" or its "right to control how its money will be loaned" as property rights.

Such a fiduciary fraud theory has been embraced by the Sixth Circuit (*United States v. Runnels,* 833 F.2d 1183, 1186–88 (6th Cir.1987)). Most recently, in a case factually indistinguishable from *Runnels* and this one, the Second Circuit has squarely rejected the theory (*United States v. Covino,* 837 F.2d 65 (2d Cir.1988)). Other Circuits have spoken with less clarity. In *United States v. Piccolo,* 835 F.2d 517 (3d Cir.1987) the majority seems to accept the invalidity of a fiduciary fraud instruction, but it upholds the conviction because it concludes the jury had to have found a deprivation of property, which was also charged. Judge Aldisert's dissent explicitly repudiates the fiduciary fraud theory (*id.* at 521–22). On the other hand, *United States v. Richerson,* 833 F.2d 1147, 1156–57 (5th Cir.1987) seems to approve the fiduciary fraud theory,[26] but in upholding the conviction the court relies more heavily on the proof at trial that money and property had in fact been lost.

Faced with such conflicting authority, this Court finds it most profitable (as it would do in any event) to return to first principles—in this instance *McNally* and *Carpenter.* That revisit makes it plain the government's theory to support August ¶ 18(a) fails.

---

**24.** That does not of course mean the dicta referred to in this text paragraph are to be discounted. Neither the Supreme Court nor the Court of Appeals inserts gratuitous comments in its opinions to mislead lower courts and litigants.

**25.** It is not easy to characterize the government's theory. In addition to its opening brief and reply memorandum, which were authorized by this Court, the government has submitted a supplemental memorandum as to *Carpenter,* and most recently a letter dated January 14, without seeking leave of court to do so. At least to this Court, the government's theory of the case seems to shift its focus somewhat with each filing. Defendants have shown equal alacrity in terms of tendering unsolicited materials, although their position—"whatever theory the government advances is wrong"—has been less difficult to pin down. But because the additional filings have been useful in identifying developments in this rapidly changing area, leave is granted to both sides to file all the additional materials.

**26.** *Richerson* is unclear on this point. It says, *id.* at 1156 (emphasis added):

> A scheme to defraud an employer of the right to the honest and faithful services of its employee may constitute a "scheme or artifice to defraud" as that phrase is used in the mail fraud statute. However, mere breach of a fiduciary duty by itself is not enough to support a statutory violation. Where any employee breaches a duty to his employer by concealing material information which he has a duty to disclose *and where such non-disclosure may result in harm to the employer,* the act constitutes a scheme to defraud within the purview of the statute.

That surely suggests there must be, in addition to the breach of duty by nondisclosure, an *independent* harm to the employer's interests, rather than just the "harm" inherent in being deprived of the employee's faithful services. Viewed in those terms, *Richerson* rejects the government's position.

Section 1343 proscribes use of the wires in furtherance of

> any scheme or artifice to defraud, or for obtaining money or property by means of false pretenses, representations or promises....

Even though the statute is framed in the disjunctive and the phrase "money or property" is included only in the second clause, *McNally* effectively read the legislative history of Section 1341 [27] to require that a deprivation of money or property also be a part of any scheme under the first clause.[28] From that springboard the Court took its second step, holding the public's intangible right to the faithful services of a public employee was not a property right.

Here the government ignores both these lessons. First it says an employee's breach of fiduciary duty was fraud under the common law. That much is unquestioned (*McNally*, 107 S.Ct. at 2886–89 (Stevens, J., dissenting)). Then the government concludes because the employer has a common law fraud claim, it has been deprived of a property right. But if accepted, that conclusion would simply eliminate the "money or property" requirement imposed in *McNally*. If the existence of a common law fraud action were automatically equated to the violation of a property right, *McNally* would mean nothing, because there would be no "intangible rights." [29]

But the government says there is more here. Lytle also had a fiduciary duty to disgorge his "secret profits," and his failure to do so deprived Continental of that property. That theory certainly has its appeal. According to the August Indictment Lytle received vacation homes as part of the scheme—surely they are property. Once again the government runs head on into *McNally*, where the state employees had also made secret profits. As to those profits the Court said, *id.* at 2882:

> Hunt and Gray received part of the commissions but those commissions were not the Commonwealth's money.

It can scarcely be contended the Court is so unfamiliar with basic principles of agency law to have taken that stance inadvertently.

Indeed, even before *McNally* our Court of Appeals (despite its then adherence to the sweeping intangible rights approach to mail fraud) had rejected the notion that receipt of secret profits could alone constitute mail fraud. *United States v. Feldman*, 711 F.2d 758, 763 (7th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983) (citations omitted and emphasis added) held:

> Yet not every breach of duty by an employee works as a criminal fraud, ... and receipt of secret profits, standing alone, cannot support a mail fraud conviction.... When an employee breaches a fiduciary duty to disclose information to his employer, that breach of duty can support a mail or wire fraud conviction *only* if the nondisclosed information was material to the conduct of the employer's business *and* the nondisclosure could or does result in harm to the employer.

Thus this Circuit has had a long-standing pre-*McNally* requirement of harm to the employer other than the loss of services or secret profits. It is certainly not appropriate to read that requirement out of the law, as though *McNally* had expanded rather than narrowed the scope of the mail and wire fraud statutes.

All in all, this Court concludes the *Carpenter* description of an employer's interest in the faithful services of its employees

---

**27.** See n. 6.

**28.** That reading rejected the contrary and more literal construction advanced by Justice Stevens' dissent (107 S.Ct. at 2884) and before that by virtually every Court of Appeals (including our own).

**29.** For example, Justice Stevens noted the types of nonproperty interests that can be the subject of fraud (*id.* at 2884 & n. 4). If the mere existence of a common law action for fraud

were to transform the deprivation into one of property rights, even those cases would still fall within the mail and wire fraud statutes. Even more directly, the defendant in *McNally* was unquestionably a faithless fiduciary. If that faithlessness were viewed as triggering a disentitlement to all compensation as well as any secret profits (as some common law cases hold) and hence as necessarily implicating a tangible property right, the distinction made by the *McNally* majority would vanish entirely.

as being "too ethereal" is an accurate statement of the law.[30] August ¶ 18(a) is therefore stricken.

That conclusion carries with it one added corollary. Elimination of August ¶ 18(a) makes it unnecessary to consider whether Continental's "shareholders and customers" had a right to Lytle's honest performance of his duties, independent and apart from Continental itself (for which the duties were of course performable). But all that now potentially remains of the alleged fraudulent scheme is August ¶ 18(b) (defrauding Continental of "money in the form of loans to customers of the Penn Square Bank")—a subject discussed in the next section. And that being so, the reference to "shareholders and customers" just before August ¶ 18(b) becomes totally inapropos. Those words too are stricken.

## 2. Scheme To Defraud of Money

■■ August ¶ 18(a)'s insufficiency does not however eliminate the mail fraud counts. August ¶ 18(b) alleges a scheme to deprive Continental of money, which clearly survives *McNally*. Unable to attack that allegation in legal terms, Lytle contends the factual allegations of the August Indictment do not state a violation. He says there is no allegation of any intent to cause a loss to Continental—August ¶ 18(b) refers only to "money in the form of loans." Because there is no allegation that the bank did not receive full value, Lytle says there is no fraud.

This time it is the defendants who are defeated by our highest court, for the *Carpenter* defendants made a similar argument to no avail. There Winans had intentionally used the *Wall Street Journal*'s property (confidential information) for his own purposes, in violation of *Journal* policy and his employment agreement. He did not use the information to harm the *Journal*, such as by disclosing it publicly or to a

competitor (*Carpenter*, 108 S.Ct. at 321). Rather he deprived the *Journal* of "its right to exclusive use of the information" (*id.*).

Here Lytle is accused of intentionally approving loans in violation of Continental's established policies. If that is true (as must be assumed on the present motions), Continental's right to exclusive control of its money was violated. Thus the absence of an allegation that the loans were "bad" or that Lytle knew them to be bad is not troublesome, let alone fatal. August ¶ 18(b) survives.[31]

### Vagueness; Bill of Particulars

■■ Lytle also asserts the August Indictment is too vague and must be dismissed because it does not specifically identify the prudent banking practices or Continental policies and procedures he is alleged to have violated as to each charged loan. Dismissals for vagueness are generally limited to three kinds of flawed indictments:

1. those failing to contain the elements of the offense charged,

2. those that do not "sufficiently apprise[ ] the defendant of what he must be prepared to meet" and

3. those providing insufficient information for future double jeopardy purposes (e.g., *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962)).

Here Lytle focuses on the second category in that trilogy.

■■ Without doubt the August Indictment suffices on that score. Indeed, an indictment is usually sufficient if it sets forth the words of the statute (*Hamling v. United States*, 418 U.S. 87, 117–19, 94 S.Ct. 2887, 2907–09, 41 L.Ed.2d 590 (1974))—really equivalent to the ultimate in "notice pleading" in the civil practice. And the

---

**30.** In addition to *Corvino* and *Piccolo*, the same result was also reached very recently by this Court's colleague, Honorable Paul Plunkett, in *Moore v. United States*, No. 87 C 8542, slip op. at 11–13 (N.D.Ill. Jan. 14, 1988) [Available on WESTLAW, 1988 WL 5020].

**31.** As noted earlier, the August Indictment includes bank misapplication counts as well as

wire fraud counts. Because the former incorporate the latter by reference, Lytle has asserted a sort of doctrine of infectious invalidity to urge dismissal of the misapplication counts. Of course the survival of the wire fraud counts, as upheld in this section, torpedoes that argument too.

August Indictment goes much further than that, pleading many evidentiary details. It cannot credibly be maintained that the indictment's nonspecification of which banking practices Lytle violated leaves him without adequate notice of the charges against him.

■ Lytle's alternative motion for a bill of particulars has somewhat more merit. To be sure, bills of particulars are comparatively rara aves in the criminal practice—history has afforded a much narrower scope of discovery in criminal than in civil cases, though as an original matter it would seem things would be the other way around (given the fact that liberty is at stake in the criminal prosecution but not in the civil lawsuit).[32] Nonetheless the special circumstances here make such relief appropriate.

As noted earlier, several of the loans charged in the August Indictment are for smaller amounts than those charged in the March Indictment. Lytle says this indicates Continental sometimes made more than one loan to some borrowers during the period at issue. In that situation Lytle really needs to know which loans are involved. Because the August Indictment does not allege the dates of the charged loans (despite the contrary assertion at G.Mem. 30), the government is therefore ordered to provide defendants with a bill of particulars specifying the dates of the loans referred to in August ¶¶ 22D and 24C.

### Sturgis' Separate Arguments [33]

■ While Sturgis is charged with participation in the overall scheme to deprive Continental of "money in the form of loans," his alleged involvement is limited to his repurchase of Lytle's Cheyenne investment, followed by Lytle's attempts to approve loans to Sturgis. Sturgis says the indictment fails to allege mail fraud because it omits allegations that:

1. any loan was made to Sturgis;

2. any intended loan would be in violation of Continental's policies or prudent banking practices;

3. Lytle knew the Cheyenne repurchase was for an inflated price;

4. Lytle and Sturgis agreed that Lytle would get Sturgis a loan in return for the repurchase; and

5. that repurchase was concealed from Continental.

Each of these points is wrong or irrelevant—or both.

August ¶ 19 reads:

It was a part of the scheme that defendants Patterson and Sturgis would and did confer on defendant Lytle substantial economic benefits and as a result defendant Lytle would and did fund and attempt to fund loans on behalf of Continental Bank to customers of the Penn Square Bank including defendant Sturgis, at the request of defendant without regard to prudent banking practices and Continental Bank's lending policies and procedures.

It is hard to imagine a more direct allegation that the intended loan to Sturgis was to violate Continental's lending policies. And when that is read in conjunction with August ¶ 25 (alleging the repurchase at an inflated price, followed by the attempts to obtain a loan for Sturgis) and August ¶ 26 (alleging that all defendants concealed their scheme), each of the other asserted deficiencies (except the first) is refuted.

■ As for that remaining contention, it is of course irrelevant that no loan was actually made. Section 1343 criminalizes the scheme rather than its success. This opinion has already held a scheme to obtain loans that violate a bank's lending practices comes within the statute. Therefore the August Indictment alleges a violation by Sturgis as well.

---

**32.** Perhaps the difference in historical treatment reflects the social matrix in which property values occupied a higher place in the scale than human values. In any case, the historical treatment has carried over to the present day (contrast the discovery available under the Federal Rules of Criminal Procedure with that under the Federal Rules of Civil Procedure), despite what we like to think of as a shift in societal priorities.

**33.** Sturgis joined in Lytle's motions for dismissal and is of course subject to the identical rulings on those motions. This section deals only with assertions unique to Sturgis.

## CONCLUSION

Paragraph 18(a) of the August Indictment alleges a scheme to defraud that is not within the scope of the wire fraud statute. It is stricken. That being so, the words "and its shareholders and customers" just preceding August ¶ 18(a) are also stricken. Although the government has said it intends to proceed to trial on the August Indictment and will be required to do so, dismissal of the March Indictment is deferred for the reasons stated earlier. On or before February 3, 1988 the government shall provide all defendants with the limited bill of particulars identified in this opinion. In all other respects, defendants' motions are denied.