### UNITED STATES of America, Plaintiff–Appellee,

v.

**Paul LASH (90–1449), Richard Tommasi (90–1450), Lawrence Dresner (90–1451), and Carol Ross (90–1500), Defendants–Appellants.**

Nos. 90–1449 to 90–1451 and 90–1500.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 28, 1991.

Decided June 26, 1991.

Rehearing and Rehearing En Banc Denied in Nos. 90–1449 and 90–1450 Sept. 3, 1991.

Keith Corbett, Asst. U.S. Atty., Sheldon Light (argued), Patricia L. Blake, Detroit, Mich., for plaintiff-appellee.

Harold Gurewitz (argued), Dise & Gurewitz, David S. Steingold (argued), Detroit, Mich., Joel Hoffman, William J. Weinstein (argued), Weinstein, Gordon & Hoffman, Southfield, Mich., John R. Minock (argued), Kelley & Cramer, Ann Arbor, Mich., for defendants-appellants.

Before KEITH and KRUPANSKY, Circuit Judges, and WELLFORD, Senior Circuit Judge.

KEITH, Circuit Judge.

Defendants Paul Lash ("Lash"), Richard Tommasi ("Tommasi"), and Lawrence Dres-

ner ("Dresner") appeal from their April 6, 1990, judgments of conviction and sentences for conspiracy to commit wire and mail fraud in violation of 18 U.S.C. § 371. Defendant Carol Ross ("Ross") appeals from her April 26, 1990, judgment of conviction and sentence for conspiracy to commit wire and mail fraud in violation of 18 U.S.C. § 371. (All defendants will be collectively referred to as "defendants.") For the following reasons, we AFFIRM the judgment and sentence of each defendant.

## I.

## A.

In the early 1980s, the federal Bureau of Land Management ("BLM") leased oil and gas rights on some public lands through a lottery system. The parcels had no known oil reserves. The BLM posted a list of available parcels every other month and accepted applications for fifteen days. After the application period closed, the BLM randomly selected a winner from the valid applications. The winner obtained the right to lease the oil and gas rights on the parcel offered in the lottery.

Entrepreneurs established several private "advisory services" which purported to assist investors to identify and obtain valuable leases in this lottery. In 1982, Seymour Adler ("Adler") purchased an advisory service, U.S. Western Oil & Gas ("USWOG"), from Steven Sawyer ("Sawyer"). USWOG was a small telephone sales operation (known as a "boiler room" operation) in southern Florida. Adler retained Sawyer as a consultant and hired Joe Lenihan ("Lenihan") and Tommasi to run the business. The three managers recruited salespeople, wrote "scripts" for them, and managed the office. Tommasi was a sales manager, primarily responsible for the way in which sales were made and for stepping in to handle difficult customers. Within a couple of months, USWOG had two dozen salespeople. Adler hired Lawrence Dresner ("Dresner"), an accountant, to keep the books. Later Dresner became the business manager, the person in charge when Adler was not in the office. In March 1983, the name of the business was changed to Oil and Gas Properties ("OGP").

The salespeople solicited initial investments of $4,800 and promised to prepare twelve applications for leases on properties which a geologist had advised were likely to contain valuable oil and gas reserves and on which no more than two or three other people were filing. In fact, not even BLM knew how many other applications were filed on a particular parcel until the application period closed and USWOG did not have any reliable advice as to which properties were valuable. The salespeople usually told potential customers that other clients had won leases and stated that USWOG would help negotiate with oil companies. They guaranteed that USWOG would purchase the lease for a minimum of $25,000 if no oil company offered more. However, only a very few clients ever won a drawing and none of those received the guaranteed $25,000.

Once there were a substantial number of investors, Tommasi and Lenihan invented a "load" program to solicit additional investments from those who were already customers. The "load" story usually revolved around a claim that USWOG had inside information.

In 1983, about a year after Adler bought the Florida operation, he opened a branch in Michigan, hiring Reggie Dents ("Dents") and Ross. The Michigan office used basically the same sales pitch, but made only initial sales. The loading of Michigan customers was done in Florida.

Gerry Grace ("Grace") received training at the Michigan office and joined the Florida office as a salesperson. Within two weeks, Lenihan and Tommasi left and Grace became the manager of the Florida office. Lash, who became a top salesperson, joined the Florida office in the fall of 1982 or January of 1983 and remained there after Grace arrived.

In early October 1983, the government suspended the lease lottery, advising the public that it did not know when it would resume. Nevertheless, OGP continued to sell its services, telling one investor in mid-

December that the government was increasing the number of drawings. On November 2, 1983, OGP sent a letter to its Florida customers advising them of a new toll-free telephone number in Michigan and operations in Florida ceased about that time. Grace carefully maintained the operation's records, however, bringing copies of all the information on the Florida customers to Michigan. Grace also trained Ross in Michigan to reassure clients who inquired about the suspension and to say OGP had inside information that the lottery would be resumed. Ross continued to tell customers that the operation was continuing from the Michigan office and in March 1984 told customers that an "executive" lottery would be forthcoming. A drawing was conducted from the September 1983 applications in April 1984.

In December 1983, OGP hired an answering service to answer calls when employees were not available. By January 1984, Ross and most of the other OGP employees had moved into the offices of another Adler "boilerroom", Precious Metals, Inc. ("PMI"). Even after her move to PMI offices, Ross continued to tell OGP customers that her managers were unavailable, but that she had taken over their accounts and could handle their complaints. In February 1984, OGP switched the answering service so that all OGP calls went directly to the answering service and messages were picked up each morning. The answering service was discontinued on June 13, 1984. After June 13, the answering service was requested to reissue a deposit refund check to PMI rather than OGP. Also in May and June 1984, additional funds remaining in the USWOG checking accounts were paid out.

## B.

On April 14, 1989, appellants Lash, Tommasi, Dresner, and Ross, along with two others who are not parties to this appeal, were indicted by a federal grand jury in the Eastern District of Michigan on one count of conspiracy to commit wire fraud. A superseding indictment, still charging the same offense, was returned on June 2, 1989. A jury trial commenced on October 24, 1989. The trial ended on December 21, 1989, with guilty verdicts against the four appellants. On April 6, 1990, Lash was sentenced to three years in the custody of the Attorney General, a $5,000 fine, and was ordered to pay $37,000 in restitution. On April 6, 1990, Tommasi was sentenced to sixty months in custody, with no fine or restitution. On April 6, 1990, Dresner was sentenced to one year in custody with no fine or restitution. On April 26, 1990, Ross was sentenced to one year with all but the first ninety days suspended, followed by two years of probation. Each defendant filed a timely notice of appeal.

## II.

### A. ·

Many of the issues raised on appeal arise from the constraints of the statute of limitations. The original indictment was returned on April 14, 1989. The applicable statute of limitation is five years. 18 U.S.C. § 3282. The government must show that the conspiracy continued and that at least one overt act in furtherance of the conspiracy occurred after April 14, 1984. *Grunewald v. United States*, 353 U.S. 391, 397, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957).

#### 1.

Defendants raise several arguments that the statute of limitations was not met in this case. They argue that the government was required to prove an overt act within five years of the June 2, 1989, superseding indictment, not the original April indictment.

It is well settled that a superseding indictment which does not broaden the charges against the defendants relates back to the date of the original indictment. *United States v. Saussy*, 802 F.2d 849, 852 (6th Cir.1986), *cert. denied*, 480 U.S. 907, 107 S.Ct. 1352, 94 L.Ed.2d 522 (1987). The scope of the superseding indictment is no broader than that of the original. It merely alleges more overt acts performed in furtherance of the conspiracy and provides

more detail. The dates of the conspiracy remain the same, as do the names of the conspirators and the nature and offices of the operations alleged. The allegation of additional underlying details in a superseding indictment does not compel a conclusion that the charge had been broadened. *United States v. Friedman*, 649 F.2d 199, 204 (3d Cir.1981). The original indictment clearly put defendants on notice of the charges against which they were to defend themselves at trial. While supplying different details, both documents described the same conspiracy to defraud investors during the same time frame through the operations of USWOG and OGP. Accordingly, the district court properly determined that the superseding indictment related back to the filing of the original indictment of April 14, 1989.

### 2.

■ Defendants also contend that the conspiracy ended in October 1983 when the Florida office of OGP closed or no later than December 1983 or January 1984, when the latest payments from investors were received and the last new solicitations occurred. They contend that after that time, all activity was not part of a conspiracy to commit wire fraud, but merely acts in furtherance of an agreement to conceal the conspiracy.

■ A separate agreement to conceal a conspiracy will not extend the length of a conspiracy for purposes of the statute of limitations. *Grunewald*, 353 U.S. at 401–05, 77 S.Ct. at 972–74. The *Grunewald* Court noted, however, that "a vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." *Grunewald*, 353 U.S. at 405, 77 S.Ct. at 974. This Court stated in *United States v. Howard*, 770 F.2d 57 (6th Cir. 1985) (en banc), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986), that where acts of concealment occur as an integral part of a conspiracy, before its objec-

tives have been finally attained, the government may rely on proof of such acts as extending the life of the conspiracy. *Id.* at 60–61. The acts of concealment in the instant case were both integral to the conspiracy and took place before its objectives were finally obtained.

After the government announced a suspension of the lottery, the conspirators suspended active telephone solicitation. Both the defendants and BLM, however, anticipated that BLM would resume the lottery. Defendants continued to accept calls and sought to allay the concerns of customers. The main objective of this conspiracy was to profit from fraudulently providing services to assist people applying for oil and gas leases. The continued telephone operations were integral to this objective.

The conspirators acted to insure that they would be able to resume their fraudulent business when the government resumed the lottery. OGP transferred the Florida customer records to Michigan shortly after the suspension was announced so that current customers might be contacted for additional sales when the lottery resumed. It sent a letter to Florida clients giving them a new Michigan telephone number. Transcript at 1587–1589 (Testimony of Gerry Grace). OGP maintained a "customer service department" staffed by Ross within PMI's office space. Joint Appendix at 585 (Testimony of Carol Ross). Dents told Ross that the service was necessary to answer questions about the lottery and when it was likely to resume. *Id.* at 584–88. Ross assured callers that the lottery would resume. She also falsely represented to investors that she would see to it that they got refunds when requested. *See, e.g.*, Joint Appendix at 565–73, 287d–87e (Testimony of Steven Robinson and James Ellenberger). In April 1984, the BLM did conduct another drawing, but it was conducted from the September 1983 applications. At least one customer, William Reppy, was notified that his application had been selected for a first priority, although it was disqualified because OGP had not prepared the paperwork properly.

BLM later decided to change its application fee structure. In addition to the flat fee of seventy-five dollars per application, BLM began to require advance payment of a lease fee of one dollar per acre. Since tracts were often thousands of acres, it was no longer economically feasible to continue OGP's operation. Sometime at the end of April or beginning of May 1984, Ross' position as OGP's "customer service department" was terminated. Joint Appendix at 592 (Testimony of Carol Ross). The answering service was discontinued in mid-June.

Sufficient evidence was presented to the jury for it to reasonably conclude that the conspiracy was not abandoned until after the change in the lottery rules occurred. While the lottery had merely been suspended, the defendants continued an operation to persuade customers to leave their money with the company. This operation was to further the main objective of profiting from this wire fraud scheme. The statements of assurance to customers were not merely a cover-up of the scheme. They were of the type which implemented the scheme throughout the conspiracy. Customers who did not win leases or make money were told that they would be successful in future drawings. It was essential that initial investors not realize they had been defrauded because they were to be the victims of subsequent "loading." Loading was a second phase of the operation to get further payments from those who had already lost money in the conspiracy. As a result, until the conspiracy was abandoned because of the government rules change, the false assurances served the main purpose of the conspiracy.

It therefore follows that the *Howard* test, concealment as an integral part of the conspiracy before its objectives are obtained, was met. The continued telephone operations occurred before the conspiracy's objectives were finally obtained because the main objective was the continued profit. The conspirators did not give up on this objective until the BLM rules made the scheme unprofitable. Since the telephone activity through April 1984 was in furtherance of the conspiracy's main objective and

this objective was not relinquished until after April 1984, the jury had ample evidence to support the charge of one conspiracy which extended into the statute of limitations period, not just a supplemental conspiracy to cover up alleged wrongdoing.

## B.

Lash and Tommasi argue that the district court improperly denied their Fed.R. Crim.P. 29 motions for acquittal. They argue there was insufficient evidence to support the jury's conclusion that they did not withdraw from the conspiracy before April 14, 1984. Withdrawal prior to that date would be a complete defense because of the five year statute of limitations. Without withdrawal, defendants would have continued liability for all acts in furtherance of the conspiracy, including those that occurred within the statute of limitations period.

Defendants have the burden of proving withdrawal because it is an affirmative defense. *United States v. Battista*, 646 F.2d 237, 246 (6th Cir.), *cert. denied*, 454 U.S. 1046, 102 S.Ct. 586, 70 L.Ed.2d 488 (1981). In order to establish withdrawal, a defendant must show that he or she took affirmative action to defeat or disavow the purpose of the conspiracy. *Id.; United States v. United States Gypsum Co.*, 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978). Mere cessation of activity is not sufficient. *Hyde v. United States*, 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912).

Lash concedes that his active participation in the conspiracy was terminated because the Florida office of USWOG closed, but not through action of his own. He testified that he learned of the office closing only when it was in progress. "I came in one day and things were being packed up and—and that was it." After that day, Lash never worked again at the office. Joint Appendix at 480 (Testimony of Lash). Thus there is no evidence of affirmative action by Lash. Because Lash's termination of employment was not voluntary, his reliance on cases of volun-

tary resignation, including *United States v. Nerlinger*, 862 F.2d 967 (2d Cir.1988), is unfounded. *See id.* at 970. Without affirmative action to disavow or defeat the purposes of the conspiracy, liability continues for all actions in furtherance of the conspiracy by the other conspirators. *Battista*, 646 F.2d at 246; *Blue v. United States*, 138 F.2d 351, 360 (6th Cir.1943).

The Supreme Court has ruled that even if a defendant has taken affirmative action contrary to a conspiracy, it is a jury question whether there was withdrawal if there is evidence that defendant acquiesced in the conspiracy after the affirmative act. In *Hyde*, the defendant had disclosed the existence of a conspiracy to the government. The government did not act on the disclosure and the conspirators continued to commit overt acts in furtherance of the continuing conspiracy. The jury was instructed to consider what the defendant did after the disclosure. The jury was further instructed that if after making a limited disclosure the defendant refused to further cooperate, that fact was evidence for the jury to decide whether the defendant was still "acquiescent—what his attitude of mind toward the conspiracy was." *Hyde*, 225 U.S. at 371, 32 S.Ct. at 804. The jury was then instructed that it could find the refusal to further cooperate "neutralize[d] ... the effect of his former declarations...." *Id.* The Supreme Court approved of these instructions in *Hyde*. *Id.*

■ In this case, Tommasi relies on his separation from OGP to support his claim that he withdrew from the conspiracy. Under cross examination, Joseph Lenihan, a former USWOG employee, agreed that he and Tommasi had quit, saying they would have nothing more to do with the company. Joint Appendix at 523.

There was sufficient evidence for a reasonable jury to conclude that even if Tommasi had told some other members of the conspiracy that he renounced the scheme and then ceased contact with the conspiracy, his subsequent acts neutralized his withdrawal and indicated his continued acquiescence. Continued acquiescence negates withdrawal, leaving Tommasi liable

for the continuing acts in furtherance of the conspiracy by the other conspirators. *See Hyde*, 225 U.S. at 371–72, 32 S.Ct. at 803–04.

Tommasi and Lenihan left USWOG to form their own company, National Energy Consultants Corp. ("NEC"). NEC was another advisory service for the oil and gas lottery. There was evidence presented that NEC falsely advised its clients that the parcels for which it filed applications were valuable. Joint Appendix at 515 (Testimony of Lenihan). The record also indicates that the firm used a load story based on falsely claiming insider information, a story very similar to the one used at USWOG. There was also evidence that a new rule limiting the number of contacts with prospective clients was adopted to avoid tape recording. *Id.* at 497. Both Lenihan and Martin Kirban, a loader from USWOG who left USWOG to work at NEC, testified that NEC was a fraudulent scheme modeled after USWOG. Joint Appendix at 454–55, 515 (Testimony of Martin Kirban and Joseph Lenihan)

Tommasi later in 1984 entered a partnership called Rich–Wal Energy ("Rich–Wal"). Tommasi instructed limited partners on how to sell certain oil investments and offered to handle "takeovers," the management of customers that are getting suspicious or troublesome. A drilling operation and marketing company the general partners claimed to own consisted only of an answering service. Speaking of the Rich–Wal operation, Tommasi said "[a]fter all, it's not our job to steal from each other, it's our job to steal from the clients." Joint Appendix at 314 (Testimony of Todd Fisch).

These later similar business dealings of Tommasi were evidence from which a reasonable jury could conclude that Tommasi's purported withdrawal was "neutralized" by his subsequent activity. These dealings indicate that his attitude toward the conspiracy was one of acquiescence rather than repudiation. The Supreme Court in *Hyde* ruled that evidence of state of mind after purported withdrawal was for a jury to evaluate. If a jury found that the state of mind indicated continued acquiescence, the

jury could appropriately find continuing conspiracy liability after the purported withdrawal. *Hyde*, 225 U.S. at 371–72, 32 S.Ct. at 803–04. Therefore Tommasi's Rule 29 motion was appropriately denied because the jury could have reasonably found that Tommasi's activity after leaving US-WOG indicated that he acquiesced rather than withdrew from the conspiracy. Since Lash did not leave voluntarily, he has no claim of an affirmative act of withdrawal.

### C.

■ Tommasi argues the operations of NEC and Rich–Wal should not have been admitted because the government failed to establish that they were either similar to USWOG or fraudulent. As discussed in the previous section, however, there was ample evidence that these companies were fraudulent operations similar to USWOG and were therefore relevant to show Tommasi's state of mind toward the conspiracy after he resigned his position at USWOG.

### D.

Tommasi argues that the district court improperly instructed the jury on the defense of withdrawal. He argues on appeal that the instruction did not adequately define the terms "disavow" and "good faith." Because he failed to object to the instruction before the jury began deliberating, we will review the instructions only for plain error. Fed.R.Crim.P. 30, 52(b); *United States v. Wilson*, 639 F.2d 314, 316 (6th Cir.1981). Tommasi's complaint about the words "disavow" and "good faith" is in substance an argument that cessation is sufficient to constitute withdrawal. Since we find this is an inaccurate construction of the law, we find no plain error.

■ Lash argues that the court erred in omitting an example of withdrawal he proposed. Lash proposed that the jury be instructed that withdrawal may be accomplished by "termination of [defendant's] employment with a business and with individuals who are part of a conspiracy." Lash Brief at 34–39. Because this is not a correct statement of the governing law, the district court properly rejected this instruc-

tion. As explained in section "II B" above, mere cessation of connection with the conspiracy is not sufficient to establish withdrawal. The cessation must be from a voluntary affirmative act and its effect as a withdrawal may be eliminated if the defendant's state of mind after the act evidences continued acquiescence. *See supra* section II B.

### E.

■ Tommasi argues that the supplemental instruction given to the jury, under the circumstances of the deliberations in this case, coerced the jury to return a verdict against him. This court has approved the supplemental instruction used in this case to encourage a deadlocked jury to attempt to reach a verdict. We approved the use of the Devitt and Blackmar, *Federal Jury Practice and Instructions*, § 18.15 ("Devitt and Blackmar") jury instruction in *United States v. Lewis*, 651 F.2d 1163, 1165 (6th Cir.1981). Tommasi argues that error occurred because this instruction was given after the jury had disclosed its numerical split.

In *Brasfield v. United States*, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345 (1926), the Supreme Court held that a judge's inquiry into how the jury was divided was coercive and required reversal. In the instant case, the jury volunteered the numerical split. *Id.* at 450, 47 S.Ct. at 135. Tommasi relies on two cases which are clearly distinguishable to argue that even this voluntary disclosure was coercive. In *United States v. Sae–Chua*, 725 F.2d 530 (9th Cir.1984), the court found that a lone dissenter who favored acquittal was unduly pressured by the court's supplemental instruction. The circumstances in *Sae–Chua* include that the jury foreperson reported which way the verdict was split (eleven in favor of conviction, one for acquittal) and accused the dissenter of having improperly stated that he believed the defendant was guilty but would not vote for conviction. The judge polled the jury and it became clear which juror was the dissenter. It was in this context that the court of appeals found

that the dissenting juror must have felt he was targeted by the judge to reconsider his vote. *Id.* at 532.

In *Williams v. United States*, 338 F.2d 530 (D.C.Cir.1964), also relied on by Tommasi, the court found that under the circumstances the jury's voluntary disclosure of its split was coercive. In *Williams*, however, the court's instruction focused on the minority and instructed it to "question the soundness of your reason for being in the minority." *Id.* at 533.

Where the jury has disclosed the split voluntarily and the instruction has not focussed on the minority, courts have generally upheld a supplemental charge. *See, e.g., United States v. Gabriel*, 597 F.2d 95, 100 (7th Cir.) (approving modified Allen [1] charge given after the jury sent a note saying they were hung eleven to one against the defendant), *cert. denied*, 444 U.S. 858, 100 S.Ct. 120, 62 L.Ed.2d 78 (1979); *United States v. Robinson*, 560 F.2d 507, 517 (2d Cir.1977) (finding no abuse of discretion giving two Allen-type charges after the court learned the jury was eleven votes to one in favor of conviction), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978); *Sanders v. United States*, 415 F.2d 621, 629–31 (5th Cir.1969) (approving a supplemental charge after the court learned the jury was split eleven to one in favor of conviction and favorably noting that the charge admonished the majority as well as the minority to reconsider its position), *cert. denied*, 397 U.S. 976, 90 S.Ct. 1096, 25 L.Ed.2d 271 (1970).

In the instant case, the judge learned of the numerical split when the jury volunteered the information that it was split. The note did not disclose whether the majority favored conviction or acquittal. The charge to the jury did not pressure a decision in a particular direction. In fact, the charge stated that "no juror is expected to yield a conscientious conviction he or she may have as to the weight or effect of the evidence." Joint Appendix at 867 (Supple-

mental Instruction Transcript). The court further admonished the jury to "be as leisurely in your deliberations as the occasion requires...." *Id.* at 868. We find that under the circumstances, the court's knowledge of the numerical split and the supplemental charge did not coerce the jury because the court did not know which way the jury was split and instructed each side to reconsider its position.

Tommasi argues that a note from juror Wyrick asking to be excused also demonstrates an atmosphere of coercion. Defendant relies on *United States v. Foster*, 711 F.2d 871 (9th Cir.1983), *cert. denied*, 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984), in which two jurors had written separate notes asking to be excused, one of whom noted that "there was no clear end in sight." *Id.* at 883. The court of appeals denied a mistrial noting that neither the jury nor the judge had "expressed 'a sense of frustration at the jury's failure to reach a verdict.'" *Id.* at 884 (quoting *United States v. Moore*, 653 F.2d 384, 390 (9th Cir.), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 680, 70 L.Ed.2d 646 (1981)). Tommasi seeks to deduce from this statement the logical opposite, that mistrial is required when such a frustration occurs. Logic does not yield such an inference. Any frustration that may have been present did not indicate that the jury was coerced and we find no coercion of the jury.

### F.

 Defendants argue that there should have been an instruction of multiple conspiracies—that the evidence might prove two separate conspiracies, one of which ended at the time the Florida office of OGP closed and another commencing with the closing of the Florida office. A district court is not required to give a multiple conspiracy instruction where only one conspiracy is alleged and proved. *United States v. Baker*, 855 F.2d 1353, 1357 (8th Cir.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989); *United*

---

**1.** An Allen charge is an instruction advising jurors to have deference for each other's views. Its name is derived from *Allen v. United States*,

164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), where the Supreme Court approved its use. Blacks Law Dictionary 69 (5th ed. 1979).

*States v. Toro*, 840 F.2d 1221, 1236–37 (5th Cir.1988); *United States v. Martino*, 664 F.2d 860, 875 (2d Cir.1981), *cert. denied*, 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982).

One conspiracy was proved in this case. The Florida and Michigan offices were part of a single company owned by Adler. US-WOG started in Florida and expanded to Michigan using the same operating methods and sharing personnel. The offices used the same scripts. Michigan customers were "loaded" only by salesmen in Florida. The evidence presented proved the existence of a single conspiracy. It was therefore not error for the district court not to instruct as to multiple conspiracies.

### G.

■■■■■ Defendant Dresner argues that the district court erred by admitting evidence concerning numerous Adler companies other than USWOG and OGP, particularly Precious Metals, Inc. ("PMI") and Contemporary Financial Management. The district court had broad discretion to admit evidence of crimes other than those charged or wrongful acts, pursuant to Fed. R.Evid. 404(b), if those other crimes or acts are relevant to intent or knowledge which are elements of the crime charged. *Huddleston v. United States*, 485 U.S. 681, 684–85, 108 S.Ct. 1496, 1498–99, 99 L.Ed.2d 771 (1988).

Dresner does not specifically identify what testimony he alleges was improper. Sawyer testified about a check drawn on an OGP account at the direction of Adler and signed by Dresner which Sawyer received. The check was for the purchase of fifty percent of a company owned by Sawyer. That company was later named Precious Metals, Inc. The purpose of the evidence of this check and several others was to show that Dresner discussed the issuance of checks with Sawyer and understood the nature of the transactions involved. Other checks, ones which were exchanged for cash, were also the subject of testimony. Some of this testimony involved other Adler businesses. These were evidence of

a money laundering scheme which would make avoidance of tax on OGP profits easier. The money laundering was part of the charged scheme to profit from the fraudulent sale of services connected to the government oil and gas lottery. The laundering increased the conspiracy's profits by enabling it to pay less taxes. A limiting instruction was given that the testimony was only being admitted as to intent and knowledge. Dresner had sought to present himself as only a bookkeeper who had no knowledge of illegal activity. The evidence of Dresner's participation in other similar businesses and money laundering was relevant to establish that he understood that activity at USWOG and OGP was fraudulent. The district court gave a limiting instruction that the evidence of dealings of other companies was only to be considered for proof of knowledge and intent. We find that the limiting instruction issued by the district court, and not objected to by the defendants, properly admitted acts outside the conspiracy only for proving knowledge or intent.

### H.

■■■■ Dresner further objects that the district court improperly overruled his objection to the order in which the government presented its witnesses. The district court "must have considerable discretion in controlling the mode and order of the proof at trial." *United States v. Vinson*, 606 F.2d 149, 152 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). We will not reverse a criminal conviction on the basis of a decision made in the exercise of that discretion unless the decision affects substantial rights. *Id.* Defendant relies on Fed.R.Evid. 611 to support his argument that the government was obliged to call its witnesses in a different order, calling all of the victim witnesses first. Rule 611 provides that the court shall control the interrogation of witnesses to make it effective for the ascertainment of truth, avoid needless consumption of time, and protect witnesses from undue embarrassment. Dresner has not shown how the court, by its failure to rearrange

the order of witnesses, allowed an order that was ineffective for the ascertainment of truth or which violated the other requirements of Rule 611. We therefore find no abuse of discretion.

### I.

 Dresner argues that he was denied a fair trial because the government was unable to produce the books and records of USWOG and OGP. Dresner concedes the government never possessed these records, but argues that the government might have been able to obtain them had it investigated earlier. There is no obligation that the government provide an investigation for the defense. It is only obligated to make available the evidence it does have. *United States v. Bibby,* 752 F.2d 1116, 1125 (6th Cir.1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986). This argument asserting prejudice from the government's failure to produce what it did not have thus takes the form of an objection to pre-indictment delay. In effect, Dresner argues that had the government not delayed so long before it sought an indictment, Dresner would have been able to locate the records. With the elapse of time, Dresner alleges he is not able to locate the records.

 In order to establish a due process violation based on pre-indictment delay, a defendant must demonstrate both that he suffered substantial prejudice as a result of the delay and that the government purposely delayed in order to gain a tactical advantage over the defendant. *United States v. Duncan,* 763 F.2d 220, 222 (6th Cir.1985). Here defendant has made no attempt to establish that the delay resulted from an intentional effort by the government to gain an advantage.

### J.

 Dresner argues that the prosecutor's closing rebuttal argument improperly went beyond the defense closing argument. In his closing argument, Dresner's counsel asserted that the case against Dresner was built exclusively on the testimony of three witnesses who were all cooperating members of the conspiracy. He also discussed Sawyer's laundering money with Adler. In rebuttal, the prosecutor argued that the most incriminating evidence against Dresner came from banking records and other evidence of the finances of the organization and from Dresner's own statements. In response to the argument concerning checks used for money laundering, the prosecutor mentioned Dresner's admission that he later passed other checks for Adler through Alex Pavlov to conceal the true source of certain money.

The prosecutor's rebuttal did not exceed the scope of a fair rebuttal. It demonstrated evidence from sources other than co-conspirators. There was therefore no prejudice shown from evidence beyond the defense's closing argument.

### III.

After carefully reviewing all of the arguments, we conclude that there was no reversible error. For the foregoing reasons, we AFFIRM the judgments of conviction entered and sentences imposed by the Honorable Anna Diggs Taylor of the Eastern District of Michigan.

WELLFORD, Senior Circuit Judge, concurring in part and dissenting in part:

I concur fully as to defendants Dresner and Ross and would affirm their convictions for the reasons stated by Judge Keith.

I have little doubt that defendants Lash and Tommasi continued to engage in enterprises as questionable as those of UWOG and OGP after they had completely withdrawn from these operations in controversy. The appropriate remedy, however, if each continued to engage in other fraudulent schemes after termination from those with which we are concerned in this appeal, would be for the government to pursue similar charges against them for such conduct after 1984. These other activities of Lash and Tommasi involved somewhat similar "boiler room" types of operations but they were separate and distinct from those of the others involved in the indictment.

I would make no distinction on the facts in this case from the situation in *United States v. Nerlinger*, 862 F.2d 967 (2d Cir. 1988), which involved a voluntary termination and that court's conclusion that a conspirator had effectually withdrawn from a fraudulent conspiracy by closing an account hitherto used in a fraudulent purpose. That Lash may have been terminated just as effectively concluded his opportunity to further the gas and oil scheme which continued to be pursued by the others. His withdrawal was known to the others involved without any "formal notices of withdrawal to be served upon co-conspirators." *Id.* at 974.

I believe as to defendant Lash that the record reflects that he did no work for either operation (USWOG or OGP) after 1983 and this indictment was returned in 1989. That Lash may have received checks from Volcano Mines, a company also connected with Adler, for a few months employment is insufficient, in my view, to counter the clear fact that he was disassociated with and withdrawn from all conspirators who had been actively working in the conspiracies which were the subject of the 1989 indictment. There is no evidence that Lash received any benefit from the "indictment" conspiracy after 1983. I would conclude that Lash's motion for acquittal should have been granted on statute of limitations grounds.

With regard to Tommasi, again I believe the record reflects that he did sever his relationship with OSWOG (and OGP) in 1983. Tommasi had differences with Adler, the principal operator, and withdrew from further association in 1983. He, too, received no benefits from either operation, or from Adler, after March 1983, more than six years before this indictment was brought. Under the authority of *Nerlinger, supra*, I would also conclude that a withdrawal took place and that Tommasi should have been acquitted of these charges. His subsequent activity with Lenihan (and others) should be the subject of a separate indictment, if illegal. I find no basis to "neutralize" the fact of a long past withdrawal by reference to other later suspected scheming or "wheeling and dealing" by Tommasi.

I, therefore, would dissent and reverse the convictions of defendants Lash and Tommasi.