File Name: 07a0476n.06

Filed: July 3, 2007

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No. 05-6741

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

LARRY BULLOCK,

    Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE

_____/

**OPINION**

Before:    MARTIN and DAUGHTREY, Circuit Judges; SCHWARZER, District Judge.[*]

BOYCE F. MARTIN, JR., Circuit Judge.  Defendant Larry Bullock was charged with one count of conspiracy to commit mail fraud, wire fraud, and money laundering in violation of 18 U.S.C. § 371, and two counts of aiding and abetting mail fraud in violation of 18 U.S.C. §§ 1341 and 2.  A jury convicted Bullock on all three counts.  He now appeals, claiming that there was insufficient evidence to sustain his conviction.  We disagree, and therefore **AFFIRM** Bullock's conviction.

---

[*]The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

I.

This case involves charges brought against Bullock, a Certified Public Accountant (CPA), and Gerald Rayborn, a pastor at the Mt. Sinai Missionary Baptist Church in Memphis. Bullock worked on the church's and Rayborn's personal accounts. According to the government, Rayborn and Bullock caused fraudulent tax returns to be submitted to Wells Fargo in order to assist Rayborn's procurement of home loans. Both men were charged with one count of conspiracy to commit mail fraud, wire fraud, and money laundering in violation of 18 U.S.C. § 371, and two counts of aiding and abetting mail fraud in violation of 18 U.S.C. §§ 1341 and 2.[1] They were tried separately and convicted on all counts. The relevant facts of this case are as follows.

In 2002, Rayborn and his wife, Bonnie Rayborn, decided to remodel their home. However, Bullock persuaded them to buy a new home instead. Bullock introduced the Rayborns to mortgage broker Marion Brown, who later referred them to real estate agent Vinnie Flynn. The Rayborns told Flynn that they wished to spend about $475,000. Flynn eventually located a home that the Rayborns found agreeable, and the parties settled on a sale price of $525,000. The closing date was set for April 29, 2002.

Gerald Rayborn, with Brown's assistance, applied for a mortgage loan through Wells Fargo Mortgage. Bonnie Rayborn was listed as a co-borrower. According to Bonnie Rayborn's testimony at Bullock's trial, the Rayborns did not directly give Marion Brown their financial information; rather, Bullock was responsible for submitting it. All of the loan documents sent to Wells Fargo

---

[1]Rayborn was also charged with money laundering in violation of 18 U.S.C. § 1957.

were sent through Federal Express. Included in the loan package was a document verifying Rayborn's income and employment which was signed by Bullock.

In order to determine Rayborn's loan eligibility, Wells Fargo required copies of his 2000 and 2001 federal tax returns. According to the returns sent to Wells Fargo, the Rayborns' adjusted gross income (AGI) in 2000 and 2001 was $84,274 and $103,206, respectively. Using these figures, Wells Fargo calculated an average monthly income of $6,788. The Rayborns completed the purchase of their new home on May 20, 2002. On that same day, Gerald Rayborn signed a promissory note for $498,750.00, requiring him to pay $3,318.20 a month. Also on that day, Wells Fargo wired most of the $498,750.00 to the closing agent on Rayborn's behalf. Rayborn was required to re-sign the documents that were part of his original loan package.

On August 29, 2002, the Rayborns, through their mortgage broker, applied to Wells Fargo for a refinancing loan. According to Bullock, this was done without his knowledge or assistance. The same 2000 and 2001 tax returns that were used to obtain the original loan were re-submitted to Wells Fargo. Due to Rayborn's excessive obligations and insufficient income, Wells Fargo denied the loan. In response, Rayborn submitted a copy of a lease agreement indicating that he was leasing his former residence to "Stacey Johnson" for $1,300 a month. The lease appears to be signed by Gerald Rayborn and Johnson. Wells Fargo was unaware that Johnson was Rayborn's daughter. In light of this added lease income, in addition to Rayborn's decision to pay off some credit card debt, Wells Fargo approved the refinancing loan. October 7, 2002, both Gerald and Bonnie Rayborn signed a promissory note for $486,000.00. Wells Fargo wired $483,171.08 to the closing agent.

Wells Fargo was unaware that the 2000 and 2001 federal tax returns it received were not the same tax returns that the Rayborns had submitted to the IRS. The tax returns that the Rayborns submitted to the IRS provided that in 2000 and 2001, their AGI was $7,462 and $20,634, respectively. At Bullock's trial, David Crockett, a Wells Fargo employee, testified that with this type of income, the Rayborns would have only qualified for a home loan between $40,000 and $60,000.

Johnson, Rayborn's daughter, testified at Bullock's trial that although she lived at the Rayborns' former residence, she had never signed a lease agreement, nor did she pay rent to live there. Additionally, the evidence showed that while her first name is spelled S-T-A-C-Y, the signature on the lease reads S-T-A-C-E-Y.

Also testifying at Bullock's trial was Charlotte Ware, a forensic document examiner for the United States Postal Inspection Service, who examined the signatures on the tax returns filed with the IRS and Wells Fargo. Ware concluded that Rayborn signed his name to the 2001 return submitted to Wells Fargo, and that he probably signed his name on the 2000 Wells Fargo return. She also testified that Bullock probably signed Bonnie Rayborn's name to the 2001 IRS tax return. Yet Bonnie Rayborn testified that she never would have authorized Bullock to sign tax returns on her behalf. Significantly, the evidence showed that all four returns—that is, the two IRS returns and the two inaccurate returns submitted to Wells Fargo—listed Bullock as the preparer and included his signature.

## II.

On appeal, Bullock argues that the district court erred by denying his motions for judgment of acquittal, claiming that there was insufficient evidence for a jury to convict him of two counts of

mail fraud and one count of conspiracy.[2] When reviewing a sufficiency of the evidence claim, this Court should not determine "whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original). Rather, this Court must decide whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. at 319 (emphasis in original). We review a district court's denial of a motion for a judgment of acquittal *de novo*. *United States v. Lopez-Medina*, 461 F.3d 724, 749-50 (6th Cir. 2006).

### A. Count One: Conspiracy to Commit Mail Fraud, Wire Fraud, and Money Laundering

Count One of the indictment charged Bullock and Rayborn with violating 18 U.S.C. § 371 by conspiring to: (1) commit mail fraud in violation of 18 U.S.C. § 1341, (2) commit wire fraud in violation of 18 U.S.C. § 1343, and (3) launder money in violation of 18 U.S.C. § 1957. These acts allegedly occurred between April 2 and October 20, 2002, and resulted in the procurement of a $498,750 home mortgage loan and a $486,000 refinancing loan.

For this Court to affirm Bullock's conspiracy conviction, a reasonable juror must have been able to find that the evidence showed that (1) Bullock "knowingly and willfully joined in an agreement with" Rayborn to (2) commit an offense (here, mail fraud, wire fraud, and money laundering), and (3) "there was at least one overt act in furtherance of the agreement." *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005). Bullock may be held responsible for any overt acts

---

[2]The trial record shows that after the government rested its case, Bullock did not present any additional evidence of his own.

by Rayborn, even those of which Bullock was unaware, so long as such acts were foreseeable and done in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946); *United States v. Lawson*, 872 F.2d 179, 182 (6th Cir. 1989).

Evidence that Bullock was involved in the preparation of Rayborn's loan applications and that both Bullock and Rayborn signed the fraudulent loan documents was enough to sustain the first element for conspiracy — an agreement.

Further, there was enough evidence to satisfy the second element with respect to each of the three criminal offenses. The first criminal offense, mail fraud, consists of "(1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme." *Jamieson*, 427 F.3d at 402. "A scheme to defraud includes any plan or course of action by which someone uses false, deceptive, or fraudulent pretenses, representations, or promises to deprive someone else of money." *Id.* "The government does not have to show that the defendant actually used the mails but must show that the defendant acted with knowledge that use of the mails would follow in the ordinary course of business, or that a reasonable person would have foreseen use of the mails." *United States v. Cantrell*, 278 F.3d 543, 546 (6th Cir. 2001) (internal quotation marks and citations omitted). In this case, documentary evidence and testimony, including testimony by a handwriting analyst, demonstrated that Bullock prepared and signed fraudulent tax returns and other loan documents. These documents were then sent via a common carrier (here, Federal Express) to Wells Fargo. They did not accurately reflect the income that Rayborn earned in 2000 and 2001, allowing the Rayborns to obtain loans higher than they would have been eligible for based on the earnings that were reported to the IRS.

There is also sufficient evidence to show that Bullock and Rayborn conspired to commit wire fraud, which consists of a "(1) scheme to defraud, and (2) use of an interstate electronic communication in furtherance of the scheme." *United States v. Brown*, 147 F.3d 477, 489 (6th Cir. 1998). Here, the evidence clearly shows that Wells Fargo wired money to the closing agent, unknowingly relying on fraudulent documents prepared by Bullock — i.e., different tax returns than were submitted to the IRS. It does not matter if Bullock was uncertain that the money would be wired to the closing agent because it was foreseeable that Wells Fargo would use a wire to transfer the money. *See United States v. Prince*, 214 F.3d 740, 748 n.4 (6th Cir. 2000) ("The defendant does not have to directly or personally perform the wire communication; it is sufficient that it is foreseeable that a wire communication could be used to advance the scheme to defraud.").

The third offense, money laundering, "is accomplished when a defendant 'knowingly engages . . . in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from a specified unlawful activity . . . .'" *United States v. Young*, 266 F.3d 468, 473 n.5 (6th Cir. 2001) (quoting 18 U.S.C. § 1957). Here, there was sufficient evidence for a reasonable juror to conclude that Bullock and Rayborn knowingly engaged in specified unlawful activity (mail fraud) which yielded proceeds (the loans) over $10,000. Those proceeds were then used in monetary transactions — Wells Fargo's wiring of the funds to the closing agent for the purposes of purchasing a home and refinancing a home loan.

Thus, as explained above, there was sufficient evidence to show that Bullock and Rayborn knowingly and willingly agreed to commit mail fraud, wire fraud, and money laundering. Finally, the third element of conspiracy, the commission of an overt act, is more than satisfied as the

evidence shows that Bullock prepared and submitted fraudulent tax returns, letters, and loan documents, all of which were sent to Wells Fargo.

Bullock argues that despite any evidence showing his involvement in procuring the first loan, the government did not meet its burden in demonstrating that he conspired with Rayborn to procure the refinancing loan. Specifically, Bullock claims that the Rayborns obtained this loan on their own without his knowledge or assistance. We find this argument unavailing. First, Bullock did not raise the affirmative defense of withdrawal from the conspiracy. *See United States v. Lash*, 937 F.2d 1077, 1083 (6th Cir. 1991) (explaining that a defendant has the burden of proving withdrawal from a conspiracy by demonstrating "that he or she took affirmative action," not "mere cessation of activity," "to defeat or disavow the purpose of the conspiracy"). Moreover, Bullock did nothing that could have prevented the Rayborns from refinancing their home, such as trying to have the loan documents returned to him to avoid their being re-used in another loan application. Second, assuming *arguendo* that Bullock was unaware of the submission of the fraudulent documents for the refinancing loan,[3] given Bullock's preparation of the documents and his failure to retrieve them after the first loan was approved, it was certainly foreseeable that the Rayborns might refinance the loan. *See Lawson*, 872 F.2d at 182; *see also Federal Savings and Loan Ins. Corp. v. Szarabajka*, 330 F. Supp. 1201, 1208 (N.D. Ill. 1971) (finding that the evidence was sufficient to support the jury's conclusion that the defendant's "fraudulent procurement of the original loan made the refinancing of it clearly foreseeable, and thus part of the entire conspiracy").

---

[3]Although we make this assumption for the purpose of analyzing the conspiracy count, as we explain in our discussion of the second mail fraud count, we do believe that there was sufficient evidence to show that Bullock was aware of the refinancing loan.

In sum, when viewing the evidence presented at trial in the light most favorable to the United States, we hold that a rational juror could have found beyond a reasonable doubt that Bullock knowingly participated in a conspiracy to commit mail fraud, wire fraud, and money laundering.

### B. Counts Two and Three: Aiding and Abetting Mail Fraud

The indictment alleges that Bullock and Rayborn, aiding and abetting each other, executed mail fraud. As explained above, mail fraud consists of "a scheme to defraud," by the "use of the mails in furtherance of the scheme." *See Jamieson*, 427 F.3d at 402. The government must show that Bullock had the knowledge, or a reasonable person would have foreseen, that the mails would be used in order to obtain a loan using fraudulent documents. Further, 18 U.S.C. § 2 provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

### 1. Count Two

Count Two alleges that Bullock and Rayborn, aiding and abetting each other, committed mail fraud in order to obtain the original loan. For the reasons already stated above, there is sufficient evidence to sustain Bullock's conviction on this count.

The evidence shows that Bullock, although aware of the Rayborns' modest income for the years of 2000 and 2001, assisted them in obtaining a $498,750 loan. Documents submitted at Bullock's trial clearly showed that the tax returns mailed to Wells Fargo were not duplicates of the Rayborns' actual 2000 and 2001 IRS returns, as Wells Fargo had requested. A reasonable juror could also find, based on the documentary evidence and testimony, that Bullock prepared and signed the fraudulent returns. These fraudulent returns, along with other loan documents, were sent via

Federal Express to Wells Fargo. The jury could have found that Bullock had knowledge, or that a reasonable person would have foreseen, that a common carrier would be used to transmit these documents.

Therefore, a reasonable juror could have found beyond a reasonable doubt that there was sufficient evidence to justify a conviction under Count Two.

### *2. Count Three*

Count Three alleges that on or about April 2, 2002, and leading up to October 20, 2002, Bullock and Rayborn, aiding and abetting each other, committed mail fraud. Thus, this count incorporates the procurement of the refinancing loan. Bullock "contends that there is no proof in the record to show that he was aware of or even knew of the refinancing of Gerald Rayborn's home," and as such, his conviction on this count cannot stand. Appellant's Br. at 11. He argues that the government failed to present evidence showing that he possessed knowledge of the refinancing, or that it was foreseeable that the Rayborns would attempt to refinance their loan.

We hold that a reasonable juror could have found that Bullock knew about the refinancing loan and helped the Rayborns to obtain it. In addition to the evidence relating to Bullock's involvement that we have already discussed, there was a crucial piece of evidence that tied Bullock's actions *directly* to the refinancing loan: on the forged June lease which was used to help Rayborn obtain the refinancing loan, Stacy Johnson's name was misspelled. Stacy Johnson herself testified that she had never signed the lease. Because it was highly unlikely that Rayborn would have misspelled his daughter's name, the jury at Bullock's trial could have reasonably concluded that someone other than Gerald Rayborn had drawn up the phoney lease agreement. Further, given that

a handwriting analyst had concluded that Bullock probably forged Bonnie Rayborn's signature on other documents, a reasonable juror could have found that Bullock forged Johnson's signature as well. Viewing the evidence in the light most favorable to the government, there is enough to sustain Bullock's conviction for aiding and abetting Rayborn in the commission of mail fraud for the purpose of obtaining the refinancing loan.

III.

For the reasons outlined above, Bullock's conviction is **AFFIRMED**